**NABISCO and Nabisco Brands Company, Plaintiffs,**

v.

**WARNER–LAMBERT CO., Defendant.**

No. 97 Civ. 4272(CBM).

United States District Court,
S.D. New York.

Jan. 26, 1999.

Dorsey & Whitney, by James B. Swire, Bruce R. Ewing, New York City, for Plaintiffs.

Fitzpatrick, Cella, Harper & Scinto, by Edward E. Vassallo, Donna Marie Weiner, John O'Shea, New York City, for Defendant.

*OPINION*

MOTLEY, District Judge.

## OPINION

This action involves claims of trademark infringement, false designation of origin, and unfair competition under §§ 32(1) and 43(a)(1) of the Lanham Act and state common law. Plaintiffs allege that defendant, through its sale of "Dentyne Ice" gum, is unlawfully infringing on Nabisco's "Ice Breakers" gum trademark. Nabisco is seeking injunctive relief, as well as damages, product recall, and attorney's fees. The court has moved *sua sponte* to reconsider its earlier denial of defendant's motion for summary judgment. For the reasons listed below, the court now finds that there are no genuine issues of material fact remaining, and therefore, defendant's motion is granted.

## I. FACTUAL AND PROCEDURAL BACKGROUND

The court finds and concludes that all material facts in this case are undisputed, however, the parties are in disagreement regarding their significance. This case boils down to two sugarless gums sold by two competitors who both use "Ice" as part of their identifying marks. At the heart of this dispute lies plaintiffs' allegation that the "Ice" component of Warner–Lambert's "Dentyne Ice" mark is likely to cause confusion to the public as to the origin of "Dentyne Ice," in direct violation of the Lanham Act. Thus, the salient issues to be decided are: (1) whether "Ice Breakers" is a mark worthy of trademark protection; (2) whether the "Ice Breakers" mark has established secondary meaning; and (3) whether the sale of "Dentyne Ice" in the United States is likely to cause confusion to consumers as to the ownership or origin of the "Dentyne Ice." The facts recounted below, as viewed in the light most favorable to Nabisco, are statements that Nabisco has either stated, admitted, or declined to rebut.

### A. Nabisco and "Ice Breakers"

Nabisco Inc. (hereinafter "Nabisco"), a New Jersey corporation, manufactures, dis-

tributes, and sells a wide variety of food, candy, and gum products. These products are sold throughout the United States under many well-recognized brand names. *Joint Pre–Trial Order* (hereinafter "JPTO"), p. 4, ¶ 1. One of these brands is "Ice Breakers" gum. Plaintiffs began selling "Ice Breakers" gum throughout the United States in December 1995. *JPTO*, p. 9, ¶ 7.

The "Ice Breakers" trademark, owned by Nabisco Brands Co., has been registered at the United States Patent and Trademark Office (hereinafter "USPTO") since September 3, 1996. *JPTO*, p. 5, ¶ 4. Plaintiffs claim that the "Ice Breakers" trademark symbolizes goodwill and a reputation for quality. *Compl.* at ¶ 12. Retail sales of "Ice Breakers" gum amounted to approximately $111 million in the first two years after the product was launched. *JPTO*, p. 9, ¶ 6. During this same time period, Nabisco spent approximately $29 million advertising its "Ice Breakers" gum product; $14 million in 1996 and $15 million in 1997. *JPTO*, p. 10, ¶ 10.

Plaintiffs contend that development efforts for its "Ice Breakers" gum began in 1993 and were centered around the production of a new intensively flavored mint gum. *JPTO*, p. 7, ¶ 1. However, in October 1994, one year before "Ice Breakers" was introduced into the marketplace, the largest gum competitor, Wrigley's, introduced a new gum called Winterfresh that used ice imagery in its advertising and packaging. *Tr. 9/10/98* at 9, 16–17. "Ice Breakers" is a sugarless stick gum that is sold in three flavors: peppermint, spearmint, and cinnamon. The name "Ice Breakers" was chosen in July 1994. "Ice Breakers" was meant to convey to the consumer the idea of "cool, refreshing flavor" as well as to suggest the colloquial meaning as a "tension-reliever or conversation-starter." *JPTO*, p. 8, ¶ 3. "Ice Breakers" gum comes in a holographic package with the mark "Ice Breakers" in capital letters that take up most of the front and back of the package. The brand name Breath Savers also appears above the "Ice Breakers" logo, but in much smaller lettering. Nabisco's marketing themes for "Ice Breakers" gum focus on the use of ice imagery to communi-

cate the cold refreshing taste of their "Ice Breakers" gum. *JPTO*, p. 8, ¶ 4.

### B. Warner–Lambert and "Dentyne Ice"

Warner–Lambert Co. (hereinafter "Warner–Lambert"), a New Jersey corporation, is the second leading competitor in the gum market in the United States, with a market share of 20%. Ranking second to Wrigley's, whose market share is 40%, Warner–Lambert leads third-ranked Nabisco, who retains 10% of the gum market. *JPTO*, p. 26, ¶ 1. Warner–Lambert owns the "Dentyne" brand name, which is a well-recognized, nearly one-hundred year-old brand for chewing gum. *JPTO*, pp. 5,27 ¶¶ 8,5.

"Dentyne Ice" is a coated pellet chewing gum sold in a 12 piece foil-sealed clear plastic blister package with a cardboard overwrap. The name "Dentyne" appears across the top front one-third of the package and the term "Ice" is italicized across the middle third of the package. "Ice" also appears on each blister package, and the "Dentyne Ice" logo appears numerous times across the foil backing. "Dentyne Ice" comes in three flavors: peppermint, spearmint, and cinnamon. *JPTO*, p. 6, ¶¶ 10–12.

The development of "Dentyne Ice" began in Canada in 1994 in response to the success of Wrigley's EXCEL gum, which was also a coated pellet gum sold in a blister pack with a cardboard overwrap that was released for sale in Canada in 1991. *JPTO*, p. 28, ¶ 8. Nabisco has never rebutted, in either its papers or during oral argument, Warner–Lambert's contention that "Dentyne Ice" was developed in response to the success of Wrigley's EXCEL gum. *Tr. 9/10/98* at 10,25. Due to the popular sales of EXCEL in Canada, Warner–Lambert asserts that it created a new gum with a cool fresh taste and chose to name it "Dentyne Ice." Warner–Lambert filed a trademark application for "Dentyne Ice" in Canada in November 1994, thirteen months before Nabisco launched its product in the United States, and on June 7, 1996, a registration was issued for that application. *JPTO*, pp. 28–30, ¶¶ 8–12. "Dentyne Ice" was sold in Canada beginning in either February or March 1996, two to three months

after Nabisco launched its "Ice Breakers" gum in the U.S. *JPTO,* pp. 14,30, ¶¶ 25,14.

Upon the success of "Dentyne Ice" in Canada, Warner–Lambert put together a team of employees (hereinafter "Tag Team") to determine whether it was feasible to launch "Dentyne Ice" in the United States. *JPTO,* pp. 13,31, ¶¶ 23,18. After a report was issued by the Tag Team, which never refers to Nabisco's "Ice Breakers" gum, and after Warner–Lambert's legal department gave clearance on the "Dentyne Ice" mark, Warner–Lambert filed a trademark application with the USPTO on June 4, 1996. *JPTO,* p. 6, ¶ 9. That application was opposed by Nabisco, and the opposition proceeding has been suspended pending the outcome in this case. In March 1997, Warner–Lambert launched its "Dentyne Ice" sugarless gum for sale in the United States. Sales of "Dentyne Ice" in the United States have exceeded $30 million. *JPTO,* p. 32, ¶ 25.

### C. Procedural History

This civil action was commenced on June 10, 1997. Presently before the court is defendant's motion for summary judgment. After a hearing on the motion on September 10, 1998, the court denied summary judgment on the record. However, on October 5, 1998, the first day of the scheduled trial, the court *sua sponte* moved to reconsider its earlier decision denying summary judgment. After hearing oral argument on the motion to reconsider, the court now finds and concludes that after a careful review of the facts and law in this case, Warner–Lambert has satisfied its burden in proving that there are no genuine issues of material fact in dispute as to warrant a trial. The court holds that any reasonable fact finder would find in favor of Warner–Lambert, and thus, summary judgment is appropriate. Therefore, for the reasons stated below, defendant's motion for summary judgment is granted.

## II. ANALYSIS

### A. Standard for Summary Judgment

Fed.R.Civ.P. 56(c) states that summary judgment shall be granted if "there is no genuine issue as to any material fact and ...

the moving party is entitled to a judgment as a matter of law." A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the non-moving party" *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

The moving party has the burden of establishing a prima facie case demonstrating the lack of a genuine issue of material fact. Once the moving party meets this burden, the non-moving party has the burden of providing enough evidence to support a jury verdict in its favor. *See Anderson,* 477 U.S. at 249, 106 S.Ct. 2505. In considering a summary judgment motion, all of the facts must be viewed in the most favorable manner for the non-moving party. *See Heilweil v. Mount Sinai Hosp.,* 32 F.3d 718, 721 (2d Cir.1994).

The court must decide whether the evidence presents a "genuine factual issue that properly can be resolved only by a finder of fact because it may reasonably be resolved in favor of either party" *Anderson,* 477 U.S. at 250, 106 S.Ct. 2505. The court may only grant summary judgment when "no rational jury could find in favor of the non-moving party" *Gallo v. Prudential Residential Services, Ltd.,* 22 F.3d 1219, 1224 (2d Cir.1994).

In trademark infringement cases, the district court must apply the undisputed facts to the balancing test outlined in *Polaroid Corp. v. Polarad Elecs., Corp.,* 287 F.2d 492, 495 (2d Cir.1961), and may grant summary judgment where it finds, as a matter of law, that there is no likelihood of confusion to the public. *See Lois Sportswear, USA, Inc. v. Levi Strauss & Co.,* 799 F.2d 867 (2d Cir. 1986); *Lang v. Retirement Living Publ'g Co.,* 949 F.2d 576, 580 (2d Cir.1991).

### 1. Standard for Reconsideration

■ "[B]ecause the denial of a motion for summary judgment is an interlocutory order, the trial court is free to reconsider and reverse its decision for any reason it deems sufficient, even in the absence of new evidence or an intervening change in or clarification of the substantive law" *Lavespere v. Niagara Machine & Tool Works, Inc.,* 910 F.2d 167, 185 (5th Cir.1990), *reh'g denied,*

920 F.2d 259 (5th Cir.1990); *see also, Tillman v. Mason (In re Mason)*, 191 B.R. 50, 55 (Bankr.S.D.N.Y.1996) (holding bankruptcy court is free sua sponte to reconsider its denial of party's summary judgment motion).

Therefore, the court exercises its discretion to reconsider its earlier denial of defendant's motion for summary judgment and hereby grants summary judgment on the basis that there are no disputed issues of material fact, and it appears that summary judgment to Warner–Lambert is appropriate.

### 2. Fed.R.Civ.P. 56(e) Challenge to Authenticity of Defendant's Evidence

▋ Plaintiffs challenge the sufficiency of Warner–Lambert's documentary evidence, claiming that almost all of defendant's evidence was unauthenticated. Specifically, Nabisco takes issue with Exhibits 7 and 19 to Warner–Lambert's memorandum in support of summary judgment, which consist of documents prepared by Nabisco's advertising agency, a list of third-party uses of the term "Ice," and certified copies of federal trademark registration certificates, accompanied by photographs of the products bearing the "Ice" mark. *Pls.' Mem. Supp. Summ. J.* (hereinafter "Pls.' Br.") at 7–8.

Rule 56(e) requires that "[s]upporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify" *Fed.R.Civ.P. 56(e)*. The court finds that the documents prepared by Nabisco and listed as exhibits by Warner–Lambert are sufficiently reliable, and thus authentic, given that Nabisco produced most of these documents during discovery and included them on its proposed exhibit list that is attached to the joint pre-trial order. There can be no *genuine* issue over their authenticity given Nabisco's intention to introduce such documents on its behalf at trial. The certified copies of federal trademark registrations are also sufficiently authenticated by virtue of their certified status. As for the proffered photographs of products bearing the Ice mark, the court finds that Warner–Lambert has cured any potential authenticity problems by submitting additional affidavits of

Michael F. Ciociari, Judy H. Bello, and Janice Mitchell attesting to the purchase of such products.

Given the resolution of this procedural challenge, the court now turns its attention to the merits of Warner–Lambert's summary judgment motion.

### B. Plaintiffs' Claims Under the Lanham Act

Plaintiffs bring federal law claims for trademark infringement and false designation of origin under § 32(1) and § 43(a)(1) the Lanham Act, 15 U.S.C. § 1114(1) and § 1125(a)(1), respectively. In order to prove trademark infringement or false designation under the Lanham Act, it is necessary to show a likelihood of confusion by the consuming public as to the source or sponsorship of the disputed product; in this case, "Dentyne Ice." *See Centaur Communications, Ltd. v. A/S/M Communications, Inc.* 830 F.2d 1217, 1225 (2d Cir.1987); *Lois Sportswear*, 799 F.2d at 869.

The Lanham Act provides trademark protection for two categories of marks, those that are federally registered and those that are unregistered but still qualify for protection based on their classification. Section 32(1) of the Lanham Act provides that

"[a]ny person who shall, without the consent of the registrant—

(a) use in commerce any reproduction, counterfeit, copy or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive;

(b) reproduce, counterfeit, copy or colorable imitate a registered mark and apply such reproduction, counterfeit, copy or colorable imitation to labels, signs, prints, packages, wrappers, receptacles or advertisements intended to be used in commerce upon or in connection with the sale, offering for sale, distribution, or advertising of goods or services on or in connection with which such use is likely to cause

confusion, or to cause mistake, or to deceive,

shall be liable in a civil action by the registrant ..."

15 U.S.C. § 1114(1)(1994).

Section 43(a) of the Lanham Act gives the trademark holder a broader range of protection, by prohibiting any person from using "in connection with any goods ... or any container for goods, ... any word, term, name, symbol, or device, or any combination thereof ... which ... is likely to cause confusion, or to cause mistake, or to deceive ... as to the origin, sponsorship, or approval of his or her goods ... by another person"

15 U.S.C. § 1125(a)(1994).

In order to receive trademark protection under the Lanham Act, the mark must first be classified under the following scheme: (1) arbitrary or fanciful; (2) suggestive; (3) descriptive; or (4) generic. *See Abercrombie & Fitch Co. v. Hunting World, Inc.*, 537 F.2d 4, 9 (2d Cir.1976).

Beginning in reverse order, a generic mark is a mark that receives no protection under federal trademark law. "Generic terms— 'the common descriptive name of an article or substance'—are ineligible for any trademark protection'" *Thompson Med. Co. v. Pfizer Inc.*, 753 F.2d 208, 212 (2d Cir.1985). The second category refers to marks that are descriptive. "A descriptive mark is one that 'forthwith conveys an immediate idea of the ingredients, qualities, or characteristics of the goods'" *Bristol–Myers Squibb Co. v. McNeil–P.P.C., Inc.*, 973 F.2d 1033, 1040 (2d Cir.1992). Descriptive marks, generally, are also not eligible for trademark protection, however, such marks may receive protection if they have acquired secondary meaning. *See Thompson*, 753 F.2d at 212–13. Secondary meaning gives a descriptive mark a measure of distinctiveness that identifies the mark in the public mind with a particular producer. *See Bristol–Myers*, 973 F.2d at 1041.

The third category is for marks that are suggestive. Suggestive marks are those that conjure up some image or quality of the product that is not readily apparent from, or

merely descriptive of, the name of the mark alone. *See Id.* at 1040. Suggestive marks require the consumer to use their imagination to deduce the meaning behind the mark. Suggestive marks are presumptively distinctive, and thus, require no showing of secondary meaning. *See Abercrombie & Fitch Co.*, 537 F.2d at 11. The final category is for those marks that are arbitrary or fanciful. Arbitrary marks are those that "enjoy all the rights accorded to suggestive terms as marks without the need [for] debating whether the term is 'merely descriptive' and with ease of establishing infringement" *Id.*

■ The key to determining eligibility for trademark protection is whether the mark distinguishes the trademark holder's goods from those of others. *See Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 768, 112 S.Ct. 2753, 120 L.Ed.2d 615 (1992). If the mark is registered with the USPTO, then it is presumed to be distinctive and is entitled to some trademark protection, regardless of whether the mark has acquired secondary meaning. *See Abercrombie & Fitch Co.*, 537 F.2d at 11. Unregistered marks must be suggestive, arbitrary or fanciful, or descriptive with secondary meaning, in order to receive trademark protection under the Lanham Act.

However, regardless of whether the mark is registered or unregistered, a plaintiff must prove a likelihood of confusion in order to prevail. *See e.g. W.W.W. Pharm. Co. v. The Gillette Co.*, 984 F.2d 567, 570–71 (2d Cir. 1993); *Lois Sportswear*, 799 F.2d at 871. Therefore, before turning to whether "Dentyne Ice" is likely to cause confusion to the public, it is important to classify "Ice Breakers," to determine whether it qualifies for trademark protection under the Lanham Act. *See Thompson Medical Co., Inc. v. Pfizer Inc.*, 753 F.2d 208, 213 (2d Cir.1985).

### 1. *"Ice Breakers" is a Suggestive Mark*

At issue in this case is the protectability of the "Ice Breakers" mark as used by Nabisco. Although "Ice" is the only term in common between Nabisco's "Ice Breakers" and Warner–Lambert's "Dentyne Ice," the court must analyze Nabisco's mark as a composite

when determining whether it qualifies for trademark protection. *See e.g. Banff, Ltd. v. Federated Dept. Stores, Inc.*, 841 F.2d 486, 489 (2d Cir.1988) (requiring analysis of composite "Bee Wear" mark for purposes of classifying mark for protection under Lanham Act); *Thompson*, 753 F.2d at 212–13 (determining that composite "Sportscreme" mark was descriptive in case of alleged infringement by "BEN–GAY Sportsgel" mark); *W.W.W. Pharm. Co.*, 984 F.2d at 572 (finding composite "SportStick" mark to be suggestive even though the two words making up the composite are generic in nature). Courts only depart from this method of analysis when the parties stipulate to the disputed mark in cases involving unregistered trademarks. *See e.g. Bristol–Myers*, 973 F.2d at 1040 (involving a § 43(a) false designation claim brought by the manufacturers of "Excedrin PM" against "Tylenol PM" where the parties agreed that the mark at issue was "PM").

■ In this case, Nabisco registered its "Ice Breakers" mark with the USPTO, which makes it presumptively distinctive. *See Lois Sportswear*, 799 F.2d at 871. The court finds, as a matter of law, that "Ice Breakers" is a suggestive mark. There is no real dispute between the parties as to this finding. At the summary judgment hearing on September 10, 1998, defendant's counsel twice referred to "Ice Breakers" as being a "highly suggestive mark" *Tr. 9/10/98* at 4,5. Plaintiff's counsel categorized it as suggestive or arbitrary. *Tr. 9/10/98* at 19. In Nabisco's pretrial contentions, it stated that "the cool connotations of the word 'ice' meshed well with the flavor of the product and 'ice breakers' had a colloquial meaning as a tension-reliever or conversation-starter." *JPTO*, p. 8, ¶ 3. Nabisco's marketing expert, Daniel Cohen, acknowledged in his deposition that "the name Ice, and for that matter Ice Breakers, is a name that is central to the concept of the product . . ." *Cohen Dep., Ex. 5 to Def.'s Mem. Supp. Summ. J.* (hereinafter "Def.'s Br.") at 38. In a written opinion issued by Mr. Cohen, he further stated that the name, "Ice Breakers," communicates to the consumer a "breathfreshing/ cool tasting message." *Cohen Report, Ex. 4 to Def.'s Br.* at 1.

Regardless of whether the name invokes the cool taste of the gum or the image of a tension-reliever in social settings, both connotations require a multi-step reasoning process that is not readily apparent from the name "Ice Breakers" alone. Since "Ice Breakers" is not descriptive of any quality or ingredient of gum but does imply some attributes of the product, the mark must be categorized as suggestive. As to the level of protection afforded a suggestive mark, such as "Ice Breakers," the court turns to the likelihood of confusion test as outlined below.

### 2. No Likelihood That "Dentyne Ice" Will Cause Confusion

In determining whether there is a likelihood of confusion between "Dentyne Ice" and "Ice Breakers," the court weights eight factors, as articulated in *Polaroid*, 287 F.2d at 495:(1) strength of mark; (2) degree of similarity between the marks; (3) proximity of the products; (4) whether the senior-user can bridge the gap; (5) evidence of actual confusion; (6) whether defendant adopted its mark in good faith; (7) the quality of the products; and (8) the sophistication of the consumer. *See Id.*

#### (a) Strength of the "Ice Breakers" Trademark

■ Although "Ice Breakers" is a suggestive mark, *see supra*, it does not necessarily follow that it is a strong mark. *See W.W.W. Pharm. Co.*, 984 F.2d at 572 (quoting *Lang*, 949 F.2d at 581). In order to assess the strength of a mark, the court must look at two factors: "(1) the degree to which it is inherently distinctive; and (2) the degree to which it is distinctive in the marketplace" *Id.* Here, the court finds and concludes that "Ice Breakers" is a weak mark for the reasons discussed below.

"Ice Breakers" is inherently a suggestive mark. *See Section II(B)(1), supra.* However, it has not achieved secondary meaning in the public's mind. Secondary meaning is what associates a mark with a particular source in the mind of the consumer, which may be demonstrated by a myriad of factors, including evidence of money spent on prod-

uct (*i.e.,* advertising and marketing expenditures), success in the marketplace (*i.e.,* sales and consumer studies), recognition by others in the market (*i.e.,* awards or prizes), and length and exclusivity of use (*i.e.,* attempts to plagiarize). *See Bristol–Myers,* 973 F.2d at 1041. Secondary meaning is critical to determining whether a likelihood of confusion exists because it measures the degree to which the public has come to identify "Ice Breakers" with Nabisco's gum product. *See Thompson,* 753 F.2d at 215–16.

The court finds that "Ice Breakers" has not achieved secondary meaning because it has been outshouted and outspent by its competitors in the areas of sales, advertising, and market share. According to plaintiffs' document entitled *LifeSavers Company Competitive Review, Gum Category* dated June 16, 1997 (hereinafter "the LifeSavers Report"), some listed weaknesses of "Ice Breakers" gum included being the "spending underdog, lack[ing] continuity," and being "outshouted by competitors in their key spot markets" *JPTO, Pls.' Proposed Trial Ex. 73* (hereinafter "*Ex. 73*") at 40. Nabisco records show that it was outspent in advertising its "Ice Breakers" gum as compared to its primary competition, Wrigley's Winterfresh gum. The LifeSavers Report showed that Nabisco spent only $6.3 million advertising its "Ice Breakers" gum in 1996 as compared to Wrigley's, which spent almost five times that amount, $29.5 million, on advertising its Winterfresh gum during the same time period. *JPTO, Ex. 73* at 6.[1] As for market share, "Ice Breakers" maintained only 2.4% share of the market by the end of 1996 while Wrigley's Winterfresh had almost 1½ times that amount, holding 5.7% of the market. *See Id.* These figures represent the modest success of "Ice Breakers" in the marketplace, two to three months before "Dentyne Ice" entered the market. To place these figures in context, the LifeSavers Report reflects that gum sales totaled $1.7 billion in 1996, and the gum industry spent a total of $185 million in advertising gum products in 1996. *JPTO, Ex. 73* at 4. Thus, these figures demonstrate that "Ice Breakers" is not a strong mark when viewed in its commercial context.

Additionally, the "Ice Breakers" mark is further weakened by extensive third party use of the term "Ice" within the confections field.[2] Defendant documents over 36 uses and/or registrations of the term "Ice" on chewing gum, mints, candy, and related products. *JPTO,* pp. 35–38, ¶ 34. In fact, Wrigley's Winterfresh was the first chewing gum to use "ice" imagery in its advertising, with slogans like "Icy Cool Breath that Lasts" and "Icy Cool Flavor—An Icy Cool Breath." *JPTO,* p. 34, ¶ 30. The court finds that confections is the relevant product category for two reasons. First, Nabisco's own documents and pre-trial contentions list gum as a subset of the confections category, which also includes breath mints, hard and chewy candies, and chocolate. *JPTO, Ex.73* at 4; *JPTO,* p. 4, ¶ 1. Second, the court recognizes, as plaintiff's counsel has acknowledged during oral argument, that the consumer has the freedom to choose among mints, gums, or candies to achieve breath freshening and cool taste. *Tr. 10/5/98* at 27 (questioning plaintiff's counsel, the court asked ". . . if you think your breath is ·bad you go and you buy some mints in the drugstore . . ., is that right? To which plaintiff's counsel responded, '[t]hat is one of the things you can buy, your Honor, yes' "). The defendant has demonstrated that there is significant use of the term "Ice" within the confections field. Thus, the court finds that extensive third party use and/or registration of the term "Ice" within the confections field consider-

1. However, it should be noted that there is a discrepancy in Nabisco's 1996 advertising expenditures as reported in the LifeSavers Report ($6.3 million) versus the figure listed in the joint pre-trial order ($14 million). *See, JPTO, Ex 73,* p. 6; *JPTO,* p. 10, ¶ 10. Despite this discrepancy, the court finds that neither amount is sufficient to establish that Nabisco's "Ice Breakers" had so saturated the marketplace as to have acquired secondary meaning in the public mind.

2. The following are examples defendant provides of third party use/registration of the "Ice" mark: ICELINDA for chocolate bars and chewing gums, ICE DROPS for liquid breath freshener, BLACK ICE for candy, SHOP RITE ICE BLUE MINTS, POWER MINTS ICE, SATHER'S ICE BLUE MINTS, ROBITUSSIN ICE BLUE PEPPERMINT for cough drops, ICE KISS for candy, ICE CUBES for candy, and ALPINE ICE for hard candy. *JPTO,* p. 35–38, ¶ 34.

ably weakens the strength of the "Ice Breakers" mark.

Since "Ice Breakers" has failed to achieve secondary meaning and there has been extensive use and/or registration of the "Ice" term by third parties, the court finds that "Ice Breakers" is a weak mark, entitled to little protection.

### (b) Degree of Similarity Between "Ice Breakers" and "Dentyne Ice"

■ This factor concerns whether the similarity of the marks is likely to cause confusion among potential purchasers. *See Bristol–Myers*, 973 F.2d at 1038. Looking at the marks in their entireties, this factor weights in favor of defendants. Even a cursory look at the products would reveal that they are not confusingly similar in sound or appearance.

Outside the common use of the term "Ice," "Ice Breakers" and "Dentyne Ice" do not sound the same. The products also vary greatly in their appearance. "Ice Breakers" comes in a holographic package with the name "Ice Breakers" displayed prominently on the front and back of the traditional rectangular-shaped package. Above the "Ice Breakers" mark is the "Breath Savers" brand name, although in much smaller print. "Ice Breakers" is a stick gum whereas "Dentyne Ice" is a coated pellet gum. "Dentyne Ice" comes in a twelve piece foil-sealed clear blister pack with a cardboard overwrap. On the cardboard overwrap, the well-known brand name "Dentyne," *see JPTO*, p. 5, ¶ 8, covers the front one-third of the package and "Ice" is italicized across the middle-third of the package. The "Dentyne Ice" mark is also repeatedly displayed across the foil sealed backing. "Ice Breakers" is displayed in all capital letters while the "Dentyne Ice" mark capitalizes only the initial letters.

Given these differences, the court finds that the overall impression of the products is not confusingly similar.

### (c) Proximity of the Products and Bridging the Gap

Both sides admit in the joint pre-trial order, *see JPTO*, pp. 5,7, ¶¶ 6,14, that their products are sold in the same channels of trade, *i.e.*, "mom and pop" stores, and sometimes side by side. Thus, the court accepts that "Ice Breakers" and "Dentyne Ice" compete directly.

Under the *Polaroid* test, the court must also consider the likelihood that Nabisco, the prior user, will "bridge the gap" between "Ice Breakers" and "Dentyne Ice" and compete directly with Warner–Lambert. *See Scarves by Vera, Inc. v. Todo Imports Ltd.*, 544 F.2d 1167, 1172 (2d Cir.1976). Since the two products are in direct competition, the court finds that there is no "gap" between "Ice Breakers" and "Dentyne Ice."

### (d) Evidence of Actual Confusion

■ This factor is used to assess whether any evidence of actual confusion exists between the two products. The absence of actual confusion by retail customers during periods of substantial sales, although not required for relief, does however, represent "a strong indicator that the likelihood of confusion is minimal" *Plus Products v. Plus Discount Foods, Inc.*, 722 F.2d 999, 1006 (2d Cir.1983). In the joint pre-trial order, it is an undisputed fact that "to date, Nabisco is not aware of any instances in which a consumer purchased Dentyne Ice gum while intending to purchase Ice breakers gum product" *JPTO*, p. 7, ¶ 17. Since December 1995, the date "Ice Breakers" was launched in the U.S., Nabisco has achieved factory sales totaling of $190 million. *Tr. 9/10/98* at 20. However, there has not been one reported incident of customer confusion between "Ice Breakers" and "Dentyne Ice." This lack of confusion during the last three years weights in favor of the defendant.

The parties also conducted consumer studies to show the level of potential confusion between "Ice Breakers" and "Dentyne Ice" gums. The results of plaintiffs' study indicate a 14% level of confusion between the products. *Pls.' Br.* at 19. Defendant's study claims to show a—4% rate of confusion between the products. *Ex. 44 to Def.'s Br.* at 3. Defendant challenges the methodology used in plaintiffs' study and claims that due to serious flaws in plaintiffs' study, it should be

completely discounted by the court. *Def.'s Br.* at 39–42.

A survey is considered probative if it was "fairly prepared and its results directed to relevant issues" *Sterling Drug, Inc. v. Bayer AG,* 14 F.3d 733, 741 (2d Cir.1994) (quoting *Universal City Studios v. Nintendo Co., Ltd.,* 746 F.2d 112, 118 (2d Cir.1984)). The court finds that plaintiff's methodology was flawed because its study was not targeted to the specific question of confusion between "Ice Breakers" and "Dentyne Ice." Plaintiffs' study used advertisements of the products, instead of the actual products, which could have lead to unreliable results. Both "Ice Breakers" and "Dentyne Ice" use similar advertising themes that play off the cool, breath freshening qualities of their gums. Plaintiffs' study did not control for this unintended consequence. Plaintiffs' study designer, Mr. O'Neill, ignored this potential problem when asked about it during his deposition:

Q: "Isn't it possible that respondents in your survey identified Dentyne Ice in your display because the Ice Breakers commerical sent some of the same messages that are contained in the Dentyne Ice TV commerical?"

. . .

A: "I was only interested here in the gestalt of a commercial for a particular product, I wasn't interested in the particular messages, per se, that were taken away, but I was only interested in the extent to which people who saw that totality of that commercial would either select a gum that was advertised or another one" *Ex. 39 to Def.'s Br.* at 63.

Plaintiffs also failed to use a proper "control product." A "control product" is one that "is a non-infringing product which is similar to the products at issue" *ConAgra, Inc. v. Geo A. Hormel & Co.,* 784 F.Supp. 700, 728 (D.Neb.1992); *aff'd* 990 F.2d 368 (8th Cir.1993). Plaintiffs' control product was Trident gum. Although Trident is a gum product, it fails to capture the essence of the allegedly confusing quality at issue, namely the "Ice" term or some variation of that theme. Trident, therefore, does not represent a suitable "control product" for this type of survey. Thus, plaintiffs' results cannot be sufficient as proof of meaningful actual confusion between the products.

Therefore, the court finds that the absence of any evidence of actual confusion between the products weights strongly in favor of the defendant.

**(e) Warner–Lambert's Good Faith in Adopting its "Dentyne Ice" Mark**

■ This *Polaroid* factor considers "whether the defendant adopted its mark with the intention of capitalizing on plaintiff's reputation and goodwill ... Good faith can be found if a defendant has selected a mark which reflects the product's characteristics, has requested a trademark search or has relied on the advice of counsel" *W.W.W. Pharm. Co.,* 984 F.2d at 575.

In this case, Warner–Lambert has demonstrated all three. First, defendant's mark, "Dentyne Ice," combines its well-known "Dentyne" mark and "Ice," which is suggestive of an important attribute of the product, namely its cool, refreshing taste. *Def.'s Br.* at 35. The inclusion of the "Dentyne" brand name signals an intent by Warner–Lambert to capitalize on its own reputation and goodwill. Second, Warner–Lambert's product manager for Dentyne gums requested that Warner–Lambert's legal department conduct a trademark search on "Dentyne Ice." *Tr. 9/10/98* at 11. Finally, Warner–Lambert was given clearance by its own legal department. *Ex. 34 to Def.'s Br.* at 1. Warner–Lambert's good faith may be reasonably inferred through its performance of these acts.

Furthermore, the facts that Nabisco relies on to show bad faith are insufficient. Most notably, plaintiffs argue that Warner–Lambert's monitoring of the development and sales of "Ice Breakers" prior to its launch of "Dentyne Ice" is evidence of bad faith. *Pls.' Br.* at 22–23. The court finds this argument unpersuasive. Most companies take great interest in monitoring products developed and sold by their competitors, however, this fact alone does not necessarily lead to an inference of bad faith. *See Lang,* 949 F.2d at 583–84.

Nabisco also tries to draw negative inferences from the failure of Warner–Lambert's business people to discuss "Ice Breakers" with its legal department, which was responsible for conducting a trademark search for "Dentyne Ice." *Tr. 9/10/98* at 24–25. The court finds that this lack of communication is not material to this summary judgment motion. Plaintiff has not presented any evidence to suggest that defendant was seeking to capitalize on "Ice Breakers" reputation, particularly given "Ice Breaker's" relative obscurity in the market at the time that defendant came out with its product. *See JPTO, Ex. 73* at 6 (showing "Ice Breaker's" market share to be 2.4% at the end of 1996, only two to three months prior to the introduction of "Dentyne Ice"). In addition, plaintiff has failed to rebut Warner–Lambert's contention that "Dentyne Ice" was created in Canada in response to the success of Wrigley's EXCEL gum. *Tr. 9/10/98* at 10, 25–26. Thus, in light of the facts giving rise to the selection of the "Dentyne Ice" mark and the lack of market recognition of the "Ice Breakers" product at the time "Dentyne Ice" was released for sale, the court finds that the lack of communication between the legal department and the business people does not raise a genuine issue of material fact.

### (f) Quality of the Product

"If an infringing product is of inferior quality, the senior user is entitled to protect 'the good reputation associated with his mark from the possibility of being tarnished by inferior merchandise of the junior user....'" *W.W.W. Pharm. Co.,* 984 F.2d at 575 (quoting *Scarves by Vera,* 544 F.2d at 1172). Nabisco has not claimed that its reputation has been harmed by an inferior quality gum and, therefore, the absence of this factor favors defendant.

### (g) Sophistication of the Consumer

Although it is undisputed that gum is an inexpensive, impulse item, the court finds the total absence of actual confusion and the high level of brand loyalty among gum purchasers, as admitted to by a Nabisco employee, mitigates against this factor favoring a finding of a likelihood of confusion. *See Hollander Dep., Ex.24 to Def.'s Br.* at 123–24. Thus, this factor also supports judgment for defendant.

### (h) Balancing the *Polaroid* Factors

■ When balancing the eight *Polaroid* factors, no one factor can determine the ultimate issue of likelihood of confusion to the consumer. *See W.W.W. Pharm. Co. v. The Gillette Co.,* 808 F.Supp. 1013, 1022 (S.D.N.Y. 1992), *aff'd,* 984 F.2d 567 (2d Cir.1993). To properly weigh these factors requires the court to view each factor in light of the totality of the evidence. *Id.* Thus, after balancing the *Polaroid* factors, the court finds and concludes that there is no likelihood of confusion between "Ice Breakers" and "Dentyne Ice."

"Ice Breakers" and "Dentyne Ice" do not sound the same, and the products look completely different; one is a stick gum in holographic packaging while the other is a pellet gum that is packaged in a blister pack with a cardboard overwrap. The fact that both gums use "Ice" as part of their identifying marks is not determinative of the issue, as the court finds that the products are sufficiently dissimilar, when viewed in their entirety, which outweighs this one similarity. Dentyne is an established and well-known mark that alerts the consumer as to the source of "Dentyne Ice" gum. In light of the discussion presented above, this court finds that "Ice Breakers" is a weak mark because, when viewed in its commercial context, it has not acquired secondary meaning in the public mind and there are various third-party uses of the term "Ice" within the confections field that further erodes the strength of the mark. *See, Section II(B)(2), supra.* In addition, there has been no evidence of actual confusion, nor evidence to infer bad faith on Warner–Lambert's part in adopting its "Dentyne Ice" mark. In total, a balancing of the *Polaroid* factors lead to the conclusion that there is no likelihood of confusion between the two products, "Ice Breakers" and "Dentyne Ice."

### C. Plaintiffs' State Law Claims

■ Plaintiffs also bring state law claims under New York common law for trademark

infringement and unfair competition. *Compl.* at ¶¶ 25–28. Under New York common law, as is required under federal law, a plaintiff must show a likelihood of confusion between the two products in order to prevail. *See Bristol–Myers*, 973 F.2d at 1048. New York unfair competition law also requires a showing of actual confusion and bad faith before monetary relief may be awarded. *See Milstein, Inc. v. Greger, Lawlor, Roth, Inc.*, 58 F.3d 27, 35 (2d Cir.1995). As the court has demonstrated with regard to plaintiffs' Lanham Act claims, there is no likelihood of confusion between Nabisco's "Ice Breakers" and Warner–Lambert's "Dentyne Ice." As discussed above, the court finds, as a matter of law, that plaintiffs have failed to show actual confusion between the products or bad faith on Warner–Lambert's part. Therefore, plaintiffs are not entitled to relief under their state common law infringement or unfair competition claims.

## III. CONCLUSION

Having reviewed the entire record, along with the briefs and arguments of the parties, the court holds that: (1) "Ice Breakers," as used by Nabisco, is a suggestive mark; (2) "Ice Breakers" has not acquired secondary meaning; (3) there is no likelihood of confusion, deceit, or mistake to the public as to the source of "Dentyne Ice"; and (4) plaintiffs' state law claims are denied because there is no likelihood of confusion between the two products. For the foregoing reasons, the court grants defendant's motion for summary judgment.