**ADVANCE MAGAZINE PUBLISHERS, INC., d/b/a The Condé Nast Publications, Bacardi & Company Limited, Sidney Frank Importing Company, Inc., and EventQuest, Inc., Plaintiffs,**

v.

**Jay NORRIS, Norris/Nelson Entertainment, Inc., and Tastemakers Media, LLC, Defendants.**

No. 04 Civ. 7877 (RJS).

United States District Court,
S.D. New York.

Dec. 15, 2008.

Edward E. Vassallo, Esq., Tila Marie Duhaime, Esq., and Timothy Joseph Kelly, Fitzpatrick, Cella, Harper & Scinto, New York, NY, for Plaintiffs.

Paul A. Chin, Esq., Law Offices of Paul A. Chin, New York, NY, and Paul Andrew Marber, Esq., The Cochran Firm, New York, NY, for Defendants.

MEMORANDUM AND ORDER

RICHARD J. SULLIVAN, District Judge:

This trademark infringement action centers on the parties' respective rights to use the word "Tastemakers" in connection with their commercial activities. Defendants Jay Norris ("Norris"), Norris/Nelson Entertainment, Inc., and Tastemakers Media, LLC (collectively, "Defendants") contend that they possess protectable trademark rights in the nonstylized text "Tastemakers."

Plaintiffs Advance Magazine Publishers, Inc. ("Advance"), Bacardi & Company Limited ("Bacardi"), Sidney Frank Importing Company, Inc. ("SFIC"), and EventQuest, Inc. (collectively, "Plaintiffs"), seek a declaratory judgment under 28 U.S.C. §§ 2201–2202 that: (1) a 2004 advertising campaign for Grey Goose vodka, entitled "Grey Goose Tastemakers," did not violate Defendants' trademark rights; and (2) Defendants abandoned their trademark registration of the stylized mark "Tastemakers NYC," and it is no longer valid. Defendants counterclaim for damages under both the Lanham Act, 15 U.S.C. §§ 1114, 1125(a), and the common law. They allege that Plaintiffs' advertising campaign constituted trademark infringement, misappropriation, and unfair competition.

Before the Court is Plaintiffs' motion for summary judgment. For the reasons set forth below, the record establishes that Plaintiffs' use of the word "Tastemakers" did not give rise to a sufficient likelihood of consumer confusion to violate any trademark rights Defendants may have possessed in that term at the time of the Grey Goose advertising campaign. Accordingly, Plaintiffs' motion is granted and this matter is dismissed.

## I. BACKGROUND

Between January and December 2004, Plaintiffs jointly conducted the "Grey Goose Tastemakers" advertising campaign (the "campaign"), which included a printed advertisement in certain Advance publications in September 2004. Defendants contend that they created the "Tastemakers" concept in 1996, received a federal trademark registration in 1999, and distributed printed materials bearing the "Tastemakers" mark between 1998 and 2002. Defendants further assert that they continue to organize and promote events in connection with the mark.

## A. Facts [1]

### 1. The Parties

Plaintiffs played various roles in the 2004 campaign. Advance, which conducts business under the name The Condé Nast Publications, publishes magazines such as *Vogue, GQ, Vanity Fair,* and *The New Yorker.* (Pls.' 56.1 ¶ 1.) SFIC created the Grey Goose vodka brand in 1997, and later developed Grey Goose's marketing slogan, "The World's Best Tasting Vodka." (*Id.* ¶¶ 3–5.) Bacardi acquired the Grey Goose brand from SFIC in August 2004. (*Id.* ¶¶ 9, 40.) Finally, Plaintiff EventQuest is an "event conception, promotion, and execution company," which was retained by Advance in approximately December 2003 to assist with the execution of the campaign. (*Id.* ¶¶ 24–25.)

Defendant Norris/Nelson Entertainment is a dissolved New York corporation, which engaged in no commercial activity after 1999. (*Id.* ¶¶ 54–55; *see also* Answer ¶ 3.) Defendant Jay Norris is "a charismatic individual with a knack for entertaining." (Pls.' Mem. at 3.) He was the president of Defendant Norris/Nelson Entertainment prior to that entity's dissolution, and he now serves as the president of Tastemakers Media. (Pls.' 56.1 ¶ 57.) Norris formed Defendant Tastemakers Media in 2002, and that entity now holds all of the rights and property previously held by Norris/Nelson Entertainment and its successors. (Answer ¶ 4.)

### 2. Defendants' Mark

In 1996, Norris "created" a "lifestyle concept" epitomizing "the essence of luxury and glamour," which he decided to call "Tastemakers." (Defs.' 56.1 ¶ 123.) Be-ginning in 1997, Norris conducted events and parties aimed at attracting people who wished to engage in, or be associated with, his lifestyle. (*Id.* ¶¶ 123(a)-(b), 125(a), 126(a), 145(a).) The events were held throughout the United States, as well as in Paris and Toronto. (*Id.* ¶ 145(a).)

Between 1998 and 2002, Defendants published a "nightlife guide" called "Tastemakers" (the "Guide"). (Pls.' 56.1 ¶ 67; *see also* Defs.' 56.1 ¶ 146(c).) The Guide was circulated to the public at no cost. (Pls.' 56.1 ¶ 72.) The largest distribution of a single Guide occurred in August 2001, when it was distributed with an issue of *Vibe Magazine.* (Pls.' 56.1 ¶ 69; *see also* Defs.' 56.1 ¶ 69(a).) Distribution of the Guide decreased between 1999 and 2001, and Defendants stopped producing it in February 2002. (Pls.' 56.1 ¶¶ 71, 73; Duhaime Decl. Ex. 13 at 19.) Some, but not all, of the issues contained paid advertising. (*See* Pls.' 56.1 ¶ 77.) The last paid advertisement for an alcohol product appeared in an August 2000 Guide, and the Guide never contained an advertisement for vodka. (*Id.* ¶¶ 76–77.)

On June 29, 1999, the United States Patent and Trademark Office (the "USPTO") issued United States Trademark Registration Number 2,257,214 to Norris/Nelson Entertainment for the stylized mark "Tastemakers NYC." (Pls.' 56.1 ¶ 58.) Nonetheless, Defendants did not use the mark as shown in Registration No. 2,257,214 after 1998. (Defs.' 56.1 ¶ 63(b).) At some point in 1999, Defendants filed a trademark application for the non-stylized text of the word "Tastemakers." (Pls.' 56.1 ¶ 61.) No registration was issued, and the application was abandoned in Sep-

---

1. The following facts are taken from the pleadings, the Local Rule 56.1 statements submitted by the parties, and the affidavits and exhibits submitted in connection with this motion. Where only one party's Rule 56.1 statement is cited, the opposing parties do not dispute that fact or have offered no admissible evidence to controvert that fact. Citations to additional facts in the Discussion section follow the same conventions.

tember 2001. (*Id.*) On April 1, 2006, after this litigation was commenced, the USPTO cancelled the Registration of the stylized "Tastemakers NYC" mark. (Duhaime Reply Decl. Ex. 1.)

### 3. The "Grey Goose Tastemakers" Campaign

In the fall of 2003, SFIC and Advance worked together to develop an advertising campaign for Grey Goose vodka, which was to include an insert to be printed in some of Advance's publications. (Pls.' 56.1 ¶¶ 6, 19.) In approximately December 2003, Advance retained EventQuest to design and run events in connection with the campaign. (*Id.* ¶¶ 24–25.) In January 2004, Advance and SFIC executed an agreement relating to the production and execution of the "Grey Goose Tastemakers" campaign. (*Id.* ¶ 23.)

The campaign's objectives were to: (1) capitalize on Grey Goose's slogan, "The World's Best Tasting Vodka," (2) improve sales to commercial establishments that purchase Grey Goose, and (3) continue to increase consumer demand for Grey Goose vodka. (*See* Defs.' 56.1 ¶ 16(a).) The campaign involved a contest among bartenders to invent cocktails using Grey Goose as an ingredient. (Pls.' 56.1 ¶¶ 27–28.) During the summer and fall of 2004, Advance paid EventQuest to conduct forty-eight private parties for the bartenders that advanced to the final round of the drink-recipe contest. (*Id.* ¶ 49.) Additional "Gala Events" were held in New York City, Chicago, and Miami. (*Id.* ¶ 52.) The contest culminated in a "judging party" held in Manhattan in April 2004. (*Id.*)

The finalist bartenders were also featured in a September 2004 "Special Advertising Section" that appeared in several Advance publications. (*Id.* ¶¶ 27, 47, 158; *see also* Duhaime Decl. Ex. 39.) The advertisement included a removable pamphlet-like insert that featured large pic-

tures of certain finalist bartenders, as well as their drink recipes and the bars at which they worked. (*See* Duhaime Decl. Ex. 39.) Similar information about additional finalists was listed in the back of the insert, arranged by the state in which the bartenders worked. (*Id.*) The campaign was completed in December 2004. (Pls.' 56.1 ¶ 156.)

### B. Procedural History

On October 5, 2004, Plaintiffs commenced this action pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201 *et seq.* They allege four causes of action. The first two causes seek declaratory judgments that the campaign did not violate any trademark rights possessed by Defendants. Plaintiffs' third and fourth causes seek cancellation of Defendants' trademark registration due to non-use. (Compl. ¶¶ 48–55.)

Defendants timely answered and filed counterclaims on October 25, 2004. They assert that Plaintiffs' campaign constituted misappropriation of their trademark and unfair competition, 15 U.S.C. § 1125(a); federal trademark infringement, 15 U.S.C. § 1114; and common law trademark infringement and unfair competition. (Answer ¶¶ 50–72.) Plaintiffs answered Defendants' counterclaims on November 11, 2004, and Plaintiffs moved for summary judgment on April 13, 2006. The case was reassigned to the undersigned on September 4, 2007.

### II. Discussion

Plaintiffs' claims and Defendants' counterclaims mirror each other. In essence, Plaintiffs seek a declaratory judgment that they have not infringed any cognizable trademark rights possessed by Defendants. Defendants assert that they possess such rights with respect to the word "Tastemakers"; that Plaintiffs have infringed those rights and engaged in unfair

competition; and that they are entitled to damages.

■ The elements of Defendants' common law claims for trademark infringement and unfair competition are similar to their federal claims, *see Real News Project, Inc. v. Indep. World Television, Inc.,* No. 06 Civ. 4322(GEL), 2008 WL 2229830, at *5–6 (S.D.N.Y. May 27, 2008), except that "New York unfair competition law also requires a showing of actual confusion and bad faith before monetary relief maybe awarded," *Nabisco v. Warner–Lambert Co.,* 32 F.Supp.2d 690, 702 (S.D.N.Y.1999); *see also W.W.W. Pharm. Co. v. Gillette Co.,* 984 F.2d 567, 570–71 (2d Cir.1993).

Thus, each of Defendants' counterclaims, as well as Plaintiffs' corresponding declaratory judgment action, raise two primary issues: (1) whether Defendants possess rights in the term "Tastemakers" that warrant protection under the law, and (2) if so, whether it was probable that consumers would be confused about the origin of the products described in the campaign based on Plaintiffs' use of the mark. *See Savin Corp. v. Savin Group,* 391 F.3d 439, 456 (2d Cir.2004) (quoting *Virgin Enters. v. Nawab,* 335 F.3d 141, 146 (2d Cir.2003)); *Nora Beverages, Inc. v. Perrier Group of Am., Inc.,* 269 F.3d 114, 118–19 (2d Cir. 2001).

The Court need only address the latter question in order to resolve the instant motion. There is no disputed issue of material fact with respect to whether Plaintiffs' campaign was likely to confuse consumers about the source of the products at issue. The Court finds that there was no such risk. Accordingly, Plaintiffs' motion for summary judgment is granted.

## A. Legal Standard

The standard for summary judgment is well settled. Pursuant to Rule 56(c), summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R.Civ.P. 56(c); *Matican v. City of New York,* 524 F.3d 151, 154 (2d Cir.2008). The moving party bears the burden of showing that he or she is entitled to summary judgment. *See Huminski v. Corsones,* 396 F.3d 53, 69 (2d Cir.2005).

"A dispute about a 'genuine issue' exists for summary judgment purposes where the evidence is such that a reasonable jury could decide in the non-movant's favor." *Beyer v. County of Nassau,* 524 F.3d 160, 163 (2d Cir.2008) (quoting *Guilbert v. Gardner,* 480 F.3d 140, 145 (2d Cir.2007)); *see also Anderson v. Liberty Lobby Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (summary judgment is unwarranted if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party").

## B. Trademark Claims: Likelihood of Confusion

■ In order to be entitled to relief under trademark law, Defendants must show that their mark is entitled to protection and that Plaintiffs' use of the allegedly infringing mark was likely to cause confusion amongst consumers. *See Nora Beverages,* 269 F.3d at 118–19. "The likelihood-of-confusion inquiry turns on whether 'numerous ordinary prudent purchasers are likely to be misled or confused as to the source of the product in question because of the entrance in the marketplace of defendant's mark.' " *Playtex Prods., Inc. v. Georgia–Pacific Corp.,* 390 F.3d 158, 161 (2d Cir.2004) (quoting *Cadbury Beverages, Inc. v. Cott Corp.,* 73 F.3d 474, 477–78 (2d Cir.1996)).

The likelihood of confusion element may be satisfied by "confusion as to source, sponsorship, affiliation, connection, or identification." *Star Indus. Inc. v. Bacardi & Co.*, 412 F.3d 373, 383 (2d Cir. 2005) (internal quotation marks omitted). However, there must have been a "probability of confusion; it is not sufficient if confusion is merely possible." *Nora Beverages*, 269 F.3d at 121 (internal quotation marks omitted). The party claiming infringement must demonstrate the probability of such confusion by a preponderance of the evidence. *KP Permanent Make–Up, Inc. v. Lasting Impression I, Inc.*, 543 U.S. 111, 120, 125 S.Ct. 542, 160 L.Ed.2d 440 (2004) ("[I]t is only when a plaintiff has shown likely confusion by a preponderance of the evidence that a defendant could have any need of an affirmative defense . . . ."). "The fact that on summary judgment the evidence must be construed in a light favorable to the non-moving party does not modify the standard" requiring the party claiming trademark infringement to demonstrate a likelihood of confusion. *Playtex Prods.*, 390 F.3d at 161–62 (quoting *Cadbury Beverages*, 73 F.3d at 477–78).

When assessing the likelihood of confusion, courts in this Circuit look to the eight factors articulated in *Polaroid Corp. v. Polarad Elecs. Corp.*, 287 F.2d 492, 495 (2d Cir.1961) (the "*Polaroid factors*"):

(1) the strength of the senior mark; (2) the degree of similarity between the two marks; (3) the proximity of the products; (4) the likelihood that the prior owner will "bridge the gap"; (5) actual confusion; (6) the defendant's good faith (or bad faith) in adopting its own mark; (7) the quality of defendant's product; and (8) the sophistication of the buyers.

*Savin Group*, 391 F.3d at 456. "No single factor is dispositive, nor is a court limited to consideration of only these factors."

*Brennan's, Inc. v. Brennan's Rest., L.L.C.*, 360 F.3d 125, 130 (2d Cir.2004).

## C. Analysis

In order to prevail on its motion for summary judgment, Plaintiffs must "demonstrate[ ] that there is no genuine issue of material fact on the likelihood of confusion among consumers as to the source, affiliation, or sponsorship" of the products related to Plaintiffs' campaign. *Malletier v. Dooney & Bourke, Inc.*, 561 F.Supp.2d 368, 389 (S.D.N.Y.2008). Although the Court considers each *Polaroid* factor, it does so with reference to the broader inquiry regarding the likelihood of consumer confusion. *Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co.*, 799 F.2d 867, 872 (2d Cir.1986) ("Each factor must be evaluated in the context of how it bears on the ultimate question of likelihood of confusion as to the source of the product."). Triable factual issues relating to any individual factor are relevant to the analysis, but they do not preclude a finding that summary judgment is appropriate with respect to the existence of a likelihood of confusion. *See Malletier*, 561 F.Supp.2d at 389–90 & n. 142.

### 1. Strength of Defendants' Mark

"The strength of a particular mark is measured by the degree to which it indicates source or origin of the product." *Nora Beverages*, 269 F.3d at 123. Under this standard, Defendants' "Tastemakers" mark is decidedly weak. In order to assess that strength, the Court looks to both its inherent and acquired distinctiveness. *Playtex Prods.*, 390 F.3d at 163; *see also Brennan's Rest.*, 360 F.3d at 130–31. First, the mark lacks inherent distinctiveness because it is merely descriptive. Second, there is insufficient secondary meaning associated with Defendants' use of the mark to overcome its lack

of inherent distinctiveness, and any marketplace distinctiveness it acquired had dissipated significantly by the time Plaintiffs' 2004 campaign was executed.

 Consideration of a mark's inherent distinctiveness "includes an evaluation of the same characteristics that initially determine[ ] a mark's validity." *Time, Inc. v. Petersen Publ'g Co.*, 173 F.3d 113, 117 (2d Cir.1999). This requires classification of the mark on a scale, "in ascending order of strength, as '(1) generic; (2) descriptive; (3) suggestive; [or] (4) arbitrary or fanciful.' " *Star Indus.*, 412 F.3d at 384 (quoting *TCPIP Holding Co. v. Haar Commc'ns, Inc.*, 244 F.3d 88, 93 (2d Cir. 2001)). The parties' arguments require the Court to decide whether Defendants' mark is either descriptive or suggestive.

 "Descriptive marks are marks that describe a product or its attributes." *TCPIP Holding*, 244 F.3d at 93. Suggestive marks, on the other hand, require "imagination, thought and perception to reach a conclusion as to the nature of the goods." *Stix Prods., Inc. v. United Mercs. & Mfrs., Inc.*, 295 F.Supp. 479, 488 (S.D.N.Y.1968). Defendants' mark is descriptive because, according to contemporaneous definitions, the "Tastemakers" Guide's readers, and Defendants' own statements, the term "Tastemaker" was used to describe both Defendants' target audience and the general lifestyle concept they seek to market.[2]

 Defendants argue that their mark is not descriptive because it does not describe their products' contents, characteristics, or quality. (Defs.' Opp'n at 16.) Instead, they argue, the mark "simply suggests something about Defendants' parties and events." (*Id.* at 17.) These arguments are unconvincing. The record demonstrates that the plain meaning of the term "Tastemaker" conveys nothing unique about Defendants' business. Rather, it describes both the segment of the population that Defendants hope to reach and the general luxury oriented "lifestyle concept" that Defendants, as well as many others, wish to market to consumers and advertisers. Consumers need not employ any "imagination, thought [or] perception" to understand the link between the plain meaning of the word "Tastemaker" and Defendants' commercial activities. *Stix Prods.*, 295 F.Supp. at 488. That is, the word describes, rather than "suggests," the nature of Defendants' business.

"Tastemaker" was a dictionary-defined term as early as 1996, the year in which Norris claims to have invented the "Tastemakers" lifestyle concept. (*See* Pls.' 56.1 ¶ 120; Defs.' Opp'n at 4.) According to the

---

2. The classification of Defendants' mark along the spectrum of distinctiveness requires the fact finder to resolve the question of "how the purchasing public views the mark." *Lane Capital Mgmt., Inc. v. Lane Capital Mgmt., Inc.*, 192 F.3d 337, 345 (2d Cir.1999). A valid trademark certificate from the USPTO is *prima facie* evidence that the mark is protectible, and a certificate may, under some circumstances, give rise to a presumption that the public views the mark as inherently distinctive. *See id.* However, "[t]he presumption of validity that federal registration confers evaporates as soon as evidence of invalidity is presented." *Door Sys., Inc. v. Pro–Line Door Sys., Inc.*, 83 F.3d 169, 172 (7th Cir.1996), cited in *Lane Capital Mgmt.*, 192 F.3d at 345. In addition to the direct evidence in this case that consumers do not view Defendants' mark as distinctive, Plaintiffs, in their reply papers, provided evidence that Defendants' trademark registration was cancelled by the USPTO on April 1, 2006. (*See* Duhaime Reply Decl. Ex. 1.) Therefore, Defendants are not entitled to a presumption of inherent distinctiveness. The Court analyzes the issue of the "strength" and distinctiveness of Defendants' mark under *Polaroid* on the basis of the direct evidence in the record, affording neither presumptions nor evidentiary advantages to any party.

1996 version of *Webster's New Universal Unabridged Dictionary*, a "Tastemaker" is "a person or thing that establishes or strongly influences what is considered to be stylish, acceptable, or worthwhile in a given sphere of interest." (Duhaime Decl. Ex. 27; *see also* Pls.' 56.1 ¶ 120.)

■ "[D]ictionary definitions ... reflect the general public's perception of a mark's meaning and implication." *Murphy Door Bed Co. v. Interior Sleep Sys., Inc.*, 874 F.2d 95, 101 (2d Cir.1989); *see also Info. Superhighway, Inc. v. Talk Am., Inc.*, 395 F.Supp.2d 44, 50–51 (S.D.N.Y. 2005). The existence of a dictionary definition of the word "Tastemaker," on or before the date that Defendants claim to have created their mark, suggests that this is not a situation where the "public is said to have expropriated a term established by [the] product developer." *Murphy Door Bed*, 874 F.2d at 101. Rather, the term was common enough to be defined in the dictionary at the time Defendants adopted it as their mark. These circumstances cannot sustain a finding of "suggestiveness."

The readers of Defendants' "Tastemakers" Guides, when prompted by Defendants to do so, offered similar definitions. This buttresses the conclusion that the term has a common meaning that simply describes, among other things, Defendants' products and services. For example, one reader stated that "a Tastemaker loves to mix it up some and *enjoy the finer things*, especially nightlife ...." (*See* Duhaime Decl. Ex. 36 at 11 (emphasis added).) Thus, purchasing consumers understood Defendants' mark to describe the contents of the Guide and the lifestyle that Defendants sought to market. *See Scholastic Inc. v. Macmillan, Inc.*, 650 F.Supp. 866, 871 (S.D.N.Y.1987) (holding that a magazine title, "Classroom," was descriptive because it "immediately conveye[d] that the magazine is concerned with matters relating to teachers and students"). Defendants used the mark to describe their target readership in readily ascertainable terms that would be palatable to potential advertisers and promoters. *See PaperCutter, Inc. v. Fay's Drug Co.*, 900 F.2d 558, 563 (2d Cir.1990). Taken together, the dictionary definition and consumers' usage of the term illustrate that it was "part of the common lexicon ...." *Real News Project*, 2008 WL 2229830, at *11. Defendants' mark described a concept that was already readily understood by the public.

Commercial use of the term "Tastemakers" by third parties, without objection by Defendants (Pls.' 56.1 ¶ 152), further suggests that the mark is descriptive and lacks distinctiveness. *Streetwise Maps, Inc. v. VanDam, Inc.*, 159 F.3d 739, 744 (2d Cir.1998). There are at least two books titled *The Tastemakers*. (Pls.' 56.1 ¶¶ 130–31.) One of them was published in 1949, long before Defendants "created" their mark. (*Id.*) The National Association for the Specialty Food Trade, Inc. ("NASFT") conducts an annual event known as "Meet the Tastemakers," for which it has obtained a United States Trademark Registration. (*Id.* ¶¶ 132–35.) NASFT annually distributes approximately 220,000 copies of an informational packet that references the "Meet the Tastemakers" event. (*Id.*) Plaintiffs also present evidence of third parties' use of the term in a music album title (*id.* ¶ 138), several pieces in *Food & Wine Magazine* between March 2002 and November 2005 (*id.* ¶¶ 139–42), a magazine published in winter 2002 by BiZBash Media (*id.* ¶ 146), and a 2004 event called "Smirnoff Tastemaker Sessions" (*id.* ¶ 151). This third-party usage, coupled with the lack of direct evidence of consumer confusion, *see infra* Part II.C.4,

suggests that Defendants' mark is not distinct. Indeed, the extent of the third-party usage relating to a broad category of products suggests that the term may even be entirely generic. *See Star Indus.*, 412 F.3d at 385 ("Generic marks are those consisting of words identifying the relevant category of goods or services.")

No inferential leap is required from the common public meaning of the term "Tastemaker" to Defendants' intended meaning of the term as it relates to their commercial activities. Therefore, the Court concludes that Defendants' mark is descriptive and lacks inherent distinctiveness.

■ Having concluded that Defendants' mark exhibits little *inherent* distinctiveness, the Court must also assess its *market* distinctiveness and any secondary meaning it obtained. Under this component of the *Polaroid* "strength" analysis, the Court looks to factors such as the length of Defendants' exclusive use of the mark, evidence of advertising expenditures, consumer studies linking the mark to a source, unsolicited media coverage of the product, sales success, and attempts to plagiarize the mark. *See Bristol–Myers Squibb Co. v. McNeil–P.P.C., Inc.*, 973 F.2d 1033, 1041 (2d Cir.1992); *Info. Superhighway*, 395 F.Supp.2d at 52. Defendants have not provided credible evidence bearing favorably on any of these factors.

■ Any marketplace distinctiveness attributable to the stylized "Tastemakers NYC" mark was significantly diminished after 1998, when Defendants decided to stop using the mark's stylization and the letters "NYC." *See Petersen Publ'g*, 173 F.3d at 119 ("[T]he law of trademark ac-

cords stronger protection to the stylized version of certain words used as trademarks than to those words themselves.") (citing *Gruner + Jahr USA Publ'g v. Meredith Corp.*, 991 F.2d 1072, 1078 (2d Cir.1993)). Instead, Defendants used only the text of the word "Tastemakers," and they abandoned their application for a trademark registration in the non-stylized mark in September 2001. (Pls.' 56.1 ¶ 61.)

The evidence also suggests a steadily decreasing use of the mark by Defendants after it was registered, which prevented it from gaining marketplace distinctiveness at the time of Plaintiffs' campaign. Defendants ceased using the stylized mark as it appears on Registration Number 2,257,214 in 1998. (Defs.' 56.1 ¶ 63; Pls.' 56.1 ¶ 63.) They admit that, at that time, they had no intention of resuming use of the mark, (Pls.' 56.1 ¶ 64.) Relatedly, distribution of the "Tastemakers" Guide diminished between 1999 and 2001 (*Id.* ¶ 73), it ceased altogether by early 2002 (*id.* ¶ 70–71), and Defendants promoted fewer events in each successive year between 2001 and 2004 (*id.* ¶¶ 102–04). Defendants did not file with the USPTO any proof of continued use, or excusable non-use, of the registered mark within the six-year period prescribed by 15 U.S.C. § 1058(a). (Defs.' 56.1 ¶ 65.) As a consequence, the mark was cancelled on April 1, 2006. (Duhaime Reply Decl. Ex. 1.)

Defendants failed to offer evidence relating to the other factors that might suggest the mark had secondary meaning.[3] Although Defendants provided information regarding their advertising rates, they offer no consumer studies suggesting secondary meaning or evidence of the actual revenue derived from the advertisements

---

3. For reasons stated elsewhere in this Memorandum and Order, *see infra* Part II.C.5, Defendants' argument that Plaintiffs' use of the word "Tastemakers" in the campaign consti-

tuted plagiarism does not suggest that Defendants' mark had acquired secondary' meaning.

that appeared in their Guides. (*See* Defs.' Opp'n at 20.) Similarly, they proffer hearsay evidence of unsolicited media coverage through a witness affidavit, but there is no documentary evidence of any such coverage in the record. (*See id.*) There is also no documentation of (1) the contention that Defendants spent "approximately $1 million developing the Tastemakers brand and market" (Defs.' 56.1 ¶ 79); or (2) the alleged income relating to "Tastemakers" for the years 1999 through 2003 (Pls.' 56.1 ¶ 95). Defendants' citation to three witness depositions as "direct evidence of secondary meaning" (Defs.' Opp'n 19), does not overcome the paucity of this evidence.

Finally, Defendants' reliance on *Playboy Enterprises, Inc. v. Chuckleberry Publishing, Inc.*, 687 F.2d 563 (2d Cir.1982), is misplaced. (Defs.' Opp'n at 16–17.) In *Playboy*, the court found that Playboy's registered trademark was suggestive and exhibited strong distinctive qualities. *Playboy Enters., Inc.*, 687 F.2d at 566. On that basis, it reasoned that, "[a]lthough the word ["playboy"] may signify the aspirations of *Playboy* 's readership, it does not describe the product or its contents." *Id.* at 567. The distinctiveness of the Playboy mark was the premise for that conclusion—Playboy readers wished to be "playboys" because of the secondary meaning directly associated with both the mark and the Playboy brand. That meaning gave the term distinct attributes to which the readers could aspire. Indeed, the *Playboy* court distinguished another case, *Affiliated Hospital Products, Inc. v. Merdel Game Manufacturing Co.*, 513 F.2d 1183 (2d Cir. 1975) ("Kick'er" tabletop soccer game did not infringe plaintiff's mark of similar game called "Kik-it"), on that ground: "[U]nlike Playboy the 'Kik-it' games never achieved a high degree of distinctiveness prior to 'Kick'er's' introduction into the market ...." *Playboy*, 687 F.2d at 568.

Defendants' argument follows neither the premise nor the reasoning of *Playboy*. First, the Court has already concluded that Defendants' mark is not distinctive because it is descriptive rather than suggestive and lacks secondary meaning. *Playboy* is distinguishable on that basis alone. Second, there is no evidence that consumers' aspirations are based on any meaning specifically attributable to Defendants' mark. Rather, any relevant aspirations of Defendants' readership relate to the general common meaning of the term as described by the dictionary, Defendants' readers, and third parties engaging in similar commercial uses of the term. Accordingly, the Court concludes that Defendants' mark is descriptive, lacks inherent strength, and has not acquired secondary meaning in the marketplace. Thus, the "strength" factor under *Polaroid* weighs heavily in favor of Plaintiffs.

### 2. Similarity Of The Two Marks

When comparing two marks, courts consider their "overall impression," including "the context in which they are found and ... the totality of factors that could cause confusion among prospective purchasers." *Gruner + Jahr*, 991 F.2d at 1078. Each mark "must be compared in its entirety; juxtaposing fragments of each mark does not demonstrate whether the marks as a whole are confusingly similar." *Universal City Studios, Inc. v. Nintendo Co.*, 746 F.2d 112, 117 (2d Cir.1984). Applying these principles, the Court concludes that the parties' marks were not similar.

In order to compare the contexts in which the marks appeared, the Court looks to the materials provided by the parties. The first page of the Grey Goose "Special Advertising Section" was titled "The Tastemakers" in blue text about one half-inch in height. (Duhaime Decl. Ex. 39 at 2.) The rest of the page displayed four

Grey Goose vodka bottles that were approximately seven inches tall. (*Id.*) The Grey Goose product, not the word "Tastemakers" was central to the page. The center of the second page featured Grey Goose's slogan, "World's Best Tasting Vodka," in approximately half-inch text. (*Id.* at 4.) The word "Tastemakers" appeared in quarter-inch text at the bottom of the page.

Plaintiffs' insert, which was appended to one of the pages of the "Special Advertising Section" was titled "The Tastemaker[:] Your Ultimate Guide to Getting in the Mix." (*Id.* at 3.) The text was superimposed over a Grey Goose bottle that exceeded nine inches in height, which emphasized the vodka product more than the word "Tastemaker." (*Id.*) The next part of the insert contained several two-page spreads with large pictures of certain finalist bartenders; each spread listed the bartenders' name, the name of their bar, the city in which they worked, and their drink recipe. (*Id.* at 4–7.) The last two-page spread in the campaign insert contained the same information about additional bartenders but not their pictures. (*Id.* at 8.) The bottom right corner of the page included a stylized mark with the text "Grey Goose Tastemakers." (*Id.*) The tops of the 't's in "Tastemakers" were joined to depict a table upon which the words "Grey Goose" sat, flanked by liquor bottles on the left and glasses on the right. (*Id.*)

Defendants provided no evidence of the manner in which their mark is used when promoting parties and events, but the record contains several examples of the Guide that were published between 1998 and 2002. Although not entirely consistent, the front cover of each Guide was titled "Tastemakers" and contained a subtitle such as "Bars, Lounges, Restaurants, Clubs" (*id.* Ex. 34) or "Bars, Lounges, Restaurants, Clubs, Gear, and More" (*id.*

Ex. 35). When the Guide listed bars and events, it provided the addresses as well as descriptions of the venues. (*See, e.g., id.* Ex. 35 at 3.) No bartenders were featured, and Defendants admit that their Guide never once contained an advertisement for vodka. (Pls.' 56.1 ¶ 74.)

After reviewing the marks appearing in the printed materials submitted by the parties, the Court concludes that the key differences were that (1) Plaintiffs never used the word "Tastemakers" alone in the manner that Defendants used the mark; (2) Defendants' Guide emphasized venues, whereas Plaintiffs' advertisement emphasized the Grey Goose product and the winning bartenders instead of information about the bars; and (3) although no vodka brand ever purchased an advertisement in Defendants' Guide, Plaintiffs' advertisement prominently featured the Grey Goose product on almost ever page.

Defendants concede that Grey Goose, which is a registered trademark, is "well known and well-respected in the United States as a brand of vodka." (Pls.' 56.1 ¶¶ 153–54.) The Court finds that, in addition to the objective differences just noted between the parties' printed materials, Plaintiffs' "prominent use of [the] well-known . . . brand . . . significantly reduces, if not altogether eliminates, the likelihood that consumers will be confused as to the source of the parties' products." *Nabisco v. Warner–Lambert Co.*, 220 F.3d 43, 46 (2d Cir.2000). Plaintiffs' central display of the Grey Goose product, slogan, and trademark in connection with the term "Tastemakers" rendered the parties' usages dissimilar such that consumer confusion was highly unlikely. Therefore, the second *Polaroid* factor also strongly favors Plaintiffs' position.

### 3. Proximity Of The Products

The proximity factor "focuses on whether the two products compete with

each other. To the extent goods (or trade names) serve the same purpose, fall within the same general class, or are used together, the use of similar designations is more likely to cause confusion." *Savin Group,* 391 F.3d at 458. In assessing this factor, the Court must look to both market proximity and geographic proximity. *S B ICE, LLC v. MGN, LLC,* No. 08 Civ. 3164(DLC), 2008 WL 4682152, at *2 (S.D.N.Y. Oct. 20, 2008). "Market proximity asks whether the two products are in related areas of commerce and geographic proximity looks to the geographic separation of the products. Both elements seek to determine whether the two products have an overlapping client base that creates a potential for confusion." *Brennan's Rest.,* 360 F.3d at 130.

Defendants argue that "it is clear that Plaintiffs' ... campaign was competing with Defendants." (Defs.' Opp'n at 26.) However, they have made little effort to define the relevant products of each party, the "structure of the market[,] ... the class of customers to whom the goods are sold, the manner in which the products are advertised, [or] the channels through which the goods are sold." *Cadbury Beverages,* 73 F.3d at 480. Instead, they simply point to two products—printed media and "high profile parties and galas, at exclusive and sophisticated venues" (Defs.' Opp'n at 26)—and argue in a conclusory fashion that competitive proximity exists.

 There is, to some extent, geographic overlap between the commercial activities at issue. Advance's publications reach a national readership (*see* Pls.' 56.1 ¶ 1), and the winning drinks and bartenders in the Grey Goose contest were selected from cities throughout the country (*see* Duhaime Decl. Ex. 39). The campaign's parties for the finalist bartenders were held in those cities, and the Gala Events were conducted in New York, Chicago, and Miami. (Pl.' 56.1 ¶ 2.) Defendants' Guides described parties in Miami, Atlanta, Los Angeles, New York, and Detroit. (*See, e.g.,* Duhaime Decl. Ex. 28.) The Court assumes, although the parties point to no evidence on this point, that Defendants' Guides were distributed in these cities. Thus, the Court finds a limited amount of geographic proximity between the parties' products.

 However, the parties do not compete in connection with any print media products. "The mere fact that both products appear in print ... is far too broad a [criterion] to serve as a meaningful point of comparison." *Christian v. Alloy, Inc.,* No. 03 Civ. 10258(HB), 2004 WL 1375274, 72 U.S.P.Q.2d 1697, 1700 (S.D.N.Y. June 17, 2004); *see also Lang v. Ret. Living Pub'g Co.,* 949 F.2d 576, 582 (2d Cir.1991) (finding that both parties' activities "in the field of publishing ... [did] not render them proximate"). For the reasons discussed above with respect to the context in which the parties' marks appeared, *see supra* Part II.C.3, Defendants' Guide is entirely different from Plaintiffs' special advertising insert. Moreover, Defendants' Guide was not printed after February 2002. (Pls.' 56.1 ¶¶ 70–71.) Even assuming that all Plaintiffs are commercially responsible for the printed media produced in connection with the campaign, the "Special Advertising Section" was printed only once, in September 2004. (Pls.' 56.1 ¶ 158.) Defendants offer no authority, and the Court is aware of none, to support a finding of competitive proximity between products that were not offered within two years of each other.

 Defendants' second argument relates to the events hosted in connection with Plaintiffs' campaign. They argue that, within the "nightlife/entertainment market," Plaintiffs' "high profile parties and galas" competed with Defendants'

"parties ... and events [that] all had liquor sponsors including ... Skyy Vodka." (Defs.' Opp'n at 26–27.) However, Plaintiffs' *advertising campaign* is not a product for sale to the public with which any of Defendants' products competed or are competing. Defendants' contention that the campaign's logo "gave the impression that these events were being conducted by [Tastemakers] for Grey Goose" is relevant to the *Polaroid* analysis of likelihood of confusion, but the Court considered—and rejected—that argument in connection with the first two *Polaroid* factors, the strength and similarity of the marks at issue.

■ Moreover, the parties' *actual* products do not compete in a manner that is likely to result in consumer contusion. Plaintiff Advance sells two relevant products: magazines and advertising in those publications. (Pls.' 56.1 ¶¶ 1, 7, 11.) The Court has already found that Defendants do not compete with any Plaintiff in terms of print media products. Turning to Advance's advertising sales, the Court is guided by the principle that " '[the] concern with product proximity relates to the likelihood that customers may be confused as to the source of the products, rather than as to the products themselves.' " *Arrow Fastener Co. v. Stanley Works*, 59 F.3d 384, 396 (2d Cir.1995) (quoting *Spring Mills, Inc. v. Ultracashmere House, Ltd.*, 689 F.2d 1127, 1134 (2d Cir. 1982)) (emphasis in original). The Court finds that, because of the consumer recognition associated with the publications produced by Advance and the relative weakness of Defendants' mark, there was little cause for concern that consumers would confuse the type of advertising opportunities offered by these parties. *See Mobil Oil Corp. v. Pegasus Petroleum Corp.*, 818 F.2d 254, 258 (2d Cir.1987) ("[C]ompetitive proximity must be measured with reference to the first two *Polaroid* factors ....."). Defendants clearly did not compete with Advance in 2004 when the campaign was executed, or at any time thereafter.

■ Plaintiffs SFIC and Bacardi produce, market, and sell alcohol products, including but not limited to vodka. (*See* Pls.' 56.1 ¶¶ 2–4, 40–41, 53.) However Defendants wish to construe their "goods and services," they do not produce alcohol and therefore are not in competitive proximity with these Plaintiffs. Although alcohol products may be part of the broad entertainment field in which Defendants operate, SFIC and Bacardi, at most, "reside in a distinct submarket" of that field. *Star Indus.*, 412 F.3d at 387. These circumstances "temper" the Court's finding of a lack of competitive proximity, *see id.*, but they do not alter the conclusion that consumer confusion is unlikely based on the proximity of these parties' respective products.

■ Plaintiff EventQuest sells party- and event-planning services. (Pls.' 56.1 ¶ 24–26.) Advance "retained EventQuest ... to conceive and execute the events portion of the Grey Goose Tastemakers promotional campaign." (*Id.* ¶ 25.) Of the Plaintiffs' products, EventQuest's services are most similar to the event promotion services provided by Defendants. However, the issue is "whether [the alleged infringing party's] use of a similar mark is likely to cause consumer confusion." *Louis Vuitton Malletier v. Dooney & Bourke, Inc.*, 454 F.3d 108, 115 (2d Cir. 2006); *see also Playtex Prods., Inc. v. Georgia–Pacific Inc.*, No. 02 Civ. 7848(HB), 2003 WL 21939706, at *2 (S.D.N.Y. Aug. 12, 2003) ("Courts are not to apply this test mechanically .... but rather with a mind to the ultimate question of whether consumers are likely to be

confused.") (internal quotation marks omitted).

Moreover, of the fifty-two parties held in connection with Plaintiffs' campaign, forty-eight were private parties for the friends and family of the finalist bartenders in the contest. (Pls.' 56.1 ¶¶ 28, 47, 49, 52; Defs.' 56.1 ¶ 47(b).) Thus, the attendees at the private parties were specifically invited by the host—the producers of Grey Goose—and it was unlikely that those attendees would be confused as to the source of the word "Tastemakers" when used in connection with the campaign. With respect to the four other events—two in New York, and one each in Chicago and Miami—the vast disparity in the strength of the marks at issue made it unlikely that consumers would confuse the source of those events or the marks used to promote them. Product similarity alone is not enough to justify a finding of competitive proximity, and the target audiences for these events was distinct. *See Cadbury Beverages*, 73 F.3d at 480 (noting that "the class of customers to whom the goods are sold" is relevant to the proximity inquiry).

In addition to the geographic overlap amongst the parties' activities, the Court finds that there is limited competitive overlap between the products and services offered by Defendants, EventQuest, Bacardi, and SFIC. Each of those Plaintiffs has some connection with the "nightlife/entertainment market" defined by Defendants. However, the strength of the Grey Goose brand made it unlikely that consumers would be confused by the use of the word "Tastemakers" in connection with the campaign. Accordingly, this factor favors Plaintiffs, but not as strongly as the strength and similarity factors.

### 4. Actual Confusion

■ "Evidence that contusion has actually occurred is of course convincing evidence that confusion is likely to occur...."

*Morningside Group Ltd. v. Morningside Capital Group, L.L.C.*, 182 F.3d 133, 141 (2d Cir.1999). To demonstrate actual confusion, Defendants must show that Plaintiffs' use of the mark "could inflict commercial injury in the form of either a diversion of sales, damage to goodwill, or loss of control over reputation." *The Sports Authority, Inc. v. Prime Hospitality Corp.*, 89 F.3d 955, 963 (2d Cir.1996).

■ As their sole evidence relating to this factor, Defendants point to four witnesses who claim they were confused by Plaintiffs' campaign. (*See* Defs.' Opp'n at 27.) However, "absence of surveys is evidence that actual confusion cannot be shown ..." *The Sports Authority*, 89 F.3d at 964. Defendants' witnesses do not overcome this shortcoming because they provide little, if any, evidence of a probability that consumers were confused about the source of Plaintiffs' advertising campaign in a way that might have negative commercial implications for Defendants.

■ In fact, two of these witnesses, Malik Ado–Ibrahim and Calvin Franklin, suggested that, rather than being confused about the source of the advertisements, they thought Defendants had entered into a business relationship with Grey Goose. (*See* Defs.' Opp'n at 27–28.) However, "[i]nquiries about the relationship between an owner of a mark and an alleged infringer do not amount to actual confusion. Indeed, such inquiries are arguably premised upon a lack of confusion between the products such as to inspire the inquiry itself." *Nora Beverages*, 269 F.3d at 124; *see also Gruner + Jahr*, 991 F.2d at 1079. Consequently, only two of Defendants' four witnesses provide evidence of consumer confusion, which is insufficient to suggest actual confusion. *See Nora Beverages*, 269 F.3d at 124. The Court finds that this *Polaroid* factor favors Plaintiffs.

### 5. Plaintiffs' Good Faith

There is no evidence that Plaintiffs "adopted [the] mark with the intention of capitalizing on [Defendants'] reputation and goodwill and any confusion between his and the senior user's product." *Stanley Works,* 59 F.3d at 397 (internal quotation marks omitted). Given the relative strengths of the Grey Goose brand and Defendants' "Tastemakers" mark in 2004, it would have been irrational for Plaintiffs to expect to benefit from infringing Defendants' mark or intentionally causing consumer confusion. *See id.* The reputational disparity makes a finding of bad faith unlikely, absent direct evidence of misconduct.

Defendants' argument that Plaintiffs acted in bad faith focuses on ambiguity in the record regarding the means by which Plaintiffs chose to use the word "Tastemakers" in their campaign. (Defs.' Opp'n at 28.) However, *Russian Kurier, Inc. v. Russian American Kurier, Inc.,* 899 F.Supp. 1204, 1210 (S.D.N.Y.1995), Plaintiffs' primary authority for the argument, is inapposite. There, although the court found that "defendants' strained suggestions ... resemble false exculpatory statements," the court noted in the same sentence that "[a]t the very least they must have been aware of the existence of the plaintiffs paper." *Id.* Precisely the opposite is true here; it can hardly be said that Plaintiffs knew, or should have known, of a free nightlife guide that had not been distributed since 2002. *See Star Indus.,* 412 F.3d at 388 ("This Court has never held adoption of a mark with no knowledge of a prior similar mark to be in bad faith even in the total absence of a trademark search ....").

Moreover, Plaintiffs' basis for selecting the campaign's name was far from "strained," as in *Russian Kurier.* The word "Tastemakers" is related to the Grey Goose slogan, "World's Best *Tasting* Vodka" (Pls.' 56.1 ¶ 5 (emphasis added)), and Defendants concede that the term also refers to one of Plaintiffs' targets for the advertising campaign, bartenders. (*Id.* 56.1 ¶ 127; Defs.' 56.1 ¶ 16.) Bad faith is not established by Plaintiffs' failure to identify the precise person who made the decision regarding the campaign's name and the time at which that decision was made.

Finally, there is no evidence to suggest that Plaintiffs acted in bad faith when they decided not to terminate their campaign upon receipt of Defendants' cease and desist letter in September 2004. Plaintiffs had been executing the advertising campaign for almost nine months at that point, and it was not *per se* bad faith to reject Defendants' contention that trademark infringement had taken place. *Inc. Publ'g Corp. v. Manhattan Magazine, Inc.,* 616 F.Supp. 370, 395–96 (S.D.N.Y. 1985). Accordingly, Defendants have not offered competent evidence tending to show that Plaintiffs acted in bad faith in adopting the name of the campaign. This factor weighs in favor of Plaintiffs.

### 6. The Remaining *Polaroid* Factors

Defendants concede that the remaining *Polaroid* factors—the ability to "bridge the gap," the quality of Plaintiffs' products, and consumer sophistication—are "neutral." (Defs.' Opp'n at 29.) The Court finds this concession supported by the record.

\* \* \*

In sum, the possibility of consumer confusion in this case was significantly weakened by Defendants' diminished use of their mark by the time of Plaintiffs' campaign in 2004. Additionally, given the general strength of the Grey Goose brand and trademark, Plaintiffs' emphasis on the

vodka product, and the Grey Goose mark's close proximity to any use of the word "Tastemakers" in the campaign, consumer confusion as to the source of the goods and services at issue in this case was improbable.

Based on the foregoing analysis, Defendants have not presented evidence supporting a finding that *any* of the *Polaroid* factors favors them. The Court finds that the *Polaroid* factors bearing most directly on the marks at issue, strength and similarity, weigh heavily in Plaintiffs' favor. The competitive proximity, actual confusion, and "bad faith" factors also support Plaintiffs' position that consumer confusion based on the use of the word "Tastemakers" in the campaign was unlikely. Therefore, the Court concludes that there is no disputed issue of material fact as to whether there was a probability of confusion between Defendants' mark and Plaintiffs' advertising campaign. Simply put, there was not.

### III. CONCLUSION

For the reasons stated above, Plaintiffs' motion for summary judgment is granted. Defendants' counterclaims for trademark infringement and unfair competition are dismissed. Additionally, Plaintiffs' third and fourth causes of action are dismissed as moot in light of the USPTO's cancellation of Defendants' mark after the commencement of this action.

The Clerk of the Court is respectfully directed to enter judgment in favor of Plaintiffs with respect to their first and second causes of action, to terminate the motion docketed as document number 26, and to close this case.

SO ORDERED.