**GIGGLE, INC., f/k/a Ali Wing, Inc., Plaintiff,**

v.

**NETFOCAL INCORPORATED, d/b/a the Giggle Guide, Defendant.**

**No. 09 Civ. 4844 (BSJ)(JCF).**

United States District Court, S.D. New York.

March 5, 2012.

Lisa T. Simpson, Orrick, Herrington & Sutcliffe LLP, New York, NY, Dwight D. Lueck, Indianapolis, IL, for Plaintiff.

James S. Blank, New York, NY, for Defendant.

### Memorandum & Order

BARBARA S. JONES, District Judge.

Plaintiff, giggle, Inc., formerly-known-as Ali Wing, Inc., brought suit against Defendant, netFocal, Inc., doing-business-as The Giggle Guide, for claims of trademark infringement under the Lanham Act, 15 U.S.C. §§ 1114(1), 1125(a), and New York state law, along with claims of unfair competition and unfair and deceptive trade practices under New York state law. In its Answer, Defendant counterclaimed that Plaintiff had infringed its trademark under the Lanham Act and New York state law. Defendant now moves for summary judgment on both Plaintiff's claims and its counterclaims. For the following reasons, Defendant's Motion for Summary Judgment is GRANTED as to Plaintiff's claims and DENIED as to Defendant's counterclaims.

### Background

The following facts are undisputed and, where disputed, are drawn in the light most favorable to Plaintiff as the non-moving party.

### I. The Parties

Plaintiff does business in the consumer market of the children's goods industry. It opened its first store in 2003 and, as of May 2009, operated twelve retail stores in six states, which sell consumer children's goods, such as strollers and toys. It owns the registered mark GIGGLE HEALTHY. HAPPY. BABY. which is stylized with "GIGGLE" placed in large font above "HEALTHY. HAPPY. BABY." in much smaller font. In trying to amass a family of "GIGGLE" marks, Plaintiff has applied for registration of the marks GIGGLE BETTER BASICS and GIGGLE with the U.S. Patent and Trademark Office ("PTO"), and has been using a THE GIGGLE CRITERIA mark since 2003 to offer consumer information and recommendations on children's products. Although it has not perfected registration of the GIGGLE mark, Plaintiff has used the mark regularly in the course of its business, displaying it on its storefronts, its website, its catalogue, and the tags, labels, and packaging of its products. Most often, its use of the GIGGLE mark is in a stylized lower case, Courier-style font, set against a background of bright, pastel colors. The bulk of Plaintiff's business deals with consumer goods but, since June 2008, it has also become active in the consumer information and recommendations business through the publication of a hardcopy book entitled *Giggle Guide to Baby Care.*

Defendant does business in the industry professional market of the children's goods industry by providing trade information related to the children's goods industry under the business name "The Giggle Guide." Defendant's product collects information on children's brands, sales representatives, market centers, trade shows, and product evaluations, among other things, and packages it for retailers, vendors, distributors and other industry professionals. Its business is limited to a website located at giggleguide.com and thegiggleguide.com. Although it had already been operating under the "The Giggle Guide" name, Defendant filed an intent to use application with the PTO on November 5, 2008.

### II. The Circumstances Leading to Suit.

In June 2008, Plaintiff began promoting a new guidebook called the *Giggle Guide to Baby Gear,* while Defendant continued to operate under its "The Giggle Guide" moniker. On December 16, 2008, Defendant contacted Plaintiff about "The Giggle

Guide" and proposed a joint venture; Plaintiff responded by declining the proposal and requesting that Defendant cease use of the THE GIGGLE GUIDE mark.

As early as May 1, 2009, Defendant began sending a mass email announcing that "The Giggle Guide" was officially doing business and that it was "the new Internet home for today's children's market." Wing Decl. Ex. 14. As a result, Plaintiff received several emails from people inquiring about whether Defendant's endeavor was associated with Plaintiff's business. Those emails then led Plaintiff to pursue this lawsuit.

### Discussion

Summary judgment may only be granted when there is no genuine issue of material fact that a rational trier of fact could find in dispute. Fed.R.Civ.P. 56(c). The moving party bears this burden and all facts must be construed in the light most favorable to the non-moving party. *Rodriguez v. City of New York,* 72 F.3d 1051, 1060–61 (2d Cir.1995). The non-moving party can defeat a motion for summary judgment by identifying a genuine issue of material fact, but may not "rely merely on allegations or denials in its own pleading" to do so-only specific facts will suffice. Fed.R.Civ.P. 56(e); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87 & n. 11, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

### I. Plaintiff's Lanham Act Claims

Plaintiff claims that Defendant has infringed its common law rights in a standalone GIGGLE mark and its family of related marks, including its registered mark (GIGGLE HEALTHY. HAPPY. BABY.) and the unregistered THE GIGGLE CRITERIA and GIGGLE BETTER BASICS marks (collectively, the "GIGGLE family of marks"). Due to its particularly heavy emphasis in "GIGGLE" as its root mark, Plaintiff claims rights to all derivative marks featuring "GIGGLE," including Defendant's THE GIGGLE GUIDE mark. Further, Plaintiff does not attempt to distinguish between the members of its GIGGLE family of marks in its arguments, instead asserting rights in its marks as a family unit and in GIGGLE as a stand-alone mark.

■ The Lanham Act affords protection to both registered and unregistered marks, the primary difference being that registered marks are presumed valid and protectable. *Virgin Enters. Ltd. v. Nawab,* 335 F.3d 141, 146 (2d Cir.2003). To prove trademark infringement under either 15 U.S.C. § 1114(1) or § 1125(a), also known respectively as § 32(1) and § 43(a) of the Lanham Act, a plaintiff must satisfy a two-prong inquiry by showing 1) that its mark is protectable and 2) that there is a likelihood of consumer confusion as to the source of the goods. *Id.* The first prong is met if the mark is distinctive when categorized by the four types of marks catalogued in *Abercrombie & Fitch Co. v. Hunting World, Inc.,* 537 F.2d 4 (2d Cir. 1976), which are often referred to as the "*Abercrombie* spectrum." The second prong is decided through a balancing of the *Polaroid* factors. *Polaroid Corp. v. Polarad Elecs. Corp.,* 287 F.2d 492, 495 (2d Cir.1961).

### A. Protectability of Plaintiff's Marks

■ Abercrombie defined four categories of marks: generic, descriptive, suggestive, and arbitrary or fanciful. *Abercrombie,* 537 F.2d at 9. Only suggestive and arbitrary or fanciful marks are inherently distinctive and, as a result, automatically protectable. *Id.* at 10–11. Registered marks, as well, are presumptively distinctive, although this can be *overcome* by showing that a registered mark is generic or is descriptive without secondary

meaning. *Id.* at 11; *Nabisco v. Warner–Lambert Co.,* 32 F.Supp.2d 690, 696 (S.D.N.Y.1999). Generic marks are never protectable and descriptive marks are only protectable if they have acquired secondary meaning. *Abercrombie,* 537 F.2d at 9.

It is clear that Plaintiff's marks do not fall on either extreme of the spectrum. None of the GIGGLE family of marks are generic since they do not directly name the product sold. *Abercrombie,* 537 F.2d at 10. Neither are the marks arbitrary or fanciful, despite Plaintiff's contentions. Pl.'s Mem. Opp'n Summ. J. 9–10. GIGGLE is not a randomly chosen mark when used in connection with children's goods because there is certainly a connotation to the word "giggle" that evokes images of children laughing and playing with the products that Plaintiff sells. *See Gruner + Jahr USA Publ'g v. Meredith Corp.,* 991 F.2d 1072, 1076 (2d Cir.1993).

■ The more difficult question is whether Plaintiff's marks are descriptive without secondary meaning, descriptive with secondary meaning, or suggestive, since only the latter two categories are protectable but the separation between the three categories is minimal. *See Bristol–Myers Squibb Co. v. McNeil–P.P.C., Inc.,* 973 F.2d 1033, 1040 (2d Cir.1992). A descriptive mark has a direct connection to a good because it describes some quality or characteristic of the marked product, such as "Toddler" brand kids' shoes. *See Abercrombie,* 537 F.2d at 10; *Gruner,* 991 F.2d at 1076; *Tiny Tot Sports, Inc. v. Sporty Baby LLC,* No. 04 Civ. 4487, 2005 WL 2044944, at *4 (S.D.N.Y. Aug. 24, 2005) (finding a "BABY GOLF" mark descriptive for videos introducing children to golf). A suggestive mark, meanwhile, has an indirect connection to a good because "it requires imagination, thought and perception to reach a conclusion as to the nature of goods." *Abercrombie,* 537 F.2d at 10; *see Gruner,* 991 F.2d at 1076.

■ Each member of the GIGGLE family of marks is suggestive. They do not directly describe a quality of the goods sold by Plaintiff and several steps of the imagination are needed to conjure the idea of children's goods. As such, Plaintiff's GIGGLE family of marks is protectable.

**B. Likelihood of Confusion**

■ Even if a mark is valid and protectable, a plaintiff must still prove a likelihood of confusion to succeed on its claims. *Virgin,* 335 F.3d at 146. As the Second Circuit has emphasized, likelihood of confusion requires not just a "mere possibility" of confusion but a "probability" that consumers will be confused. *See Playtex Prods., Inc. v. Georgia–Pacific Corp.,* 390 F.3d 158, 161 (2d Cir.2004) (quoting *Nora Beverages, Inc. v. Perrier Grp. of Am., Inc.,* 269 F.3d 114, 121 (2d Cir.2001)). The eight *Polaroid* factors determine whether such a likelihood exists by assessing the following: 1) the strength of the plaintiff's mark, 2) the similarity of the defendant's mark, 3) the proximity of the products, 4) the likelihood that the plaintiff will bridge the gap between it and the defendant, 5) actual confusion, 6) the defendant's intent in adopting the mark, 7) the quality of the defendant's product, and 8) the sophistication of the consumer base. *Gruner,* 991 F.2d at 1077.

There is no precise methodology to this balancing-no one factor is necessarily dispositive but two or three factors, alone, can be. *Natural Organics, Inc. v. Nutraceutical Corp.,* 426 F.3d 576, 579 n. 1 (2d Cir.2005) (explaining that courts "need not 'slavishly recite the litany of all eight *Polaroid* factors in each and every case'") (quoting *Orient Express Trading Co. v. Federated Dep't Stores, Inc.,* 842 F.2d 650, 654 (2d Cir.1988)). The most dispositive

factor is frequently the similarity of the marks, although this is not always true. *See Playtex*, 390 F.3d at 166–67 ("In an appropriate case, the similarity-of-marks factor may alone be dispositive."); *Louis Vuitton Malletier v. Dooney & Bourke, Inc.*, 454 F.3d 108, 117 (2d Cir.2006).

### 1. The Strength of Plaintiff's Marks

■■■■ The strength of a mark depends on two factors: inherent distinctiveness and acquired distinctiveness. *Virgin*, 335 F.3d at 147. It is the burden of the party asserting rights in a mark to prove the strength of its mark. *Bristol–Myers Squibb*, 973 F.2d at 1041. Inherent distinctiveness depends on the *Abercrombie* spectrum, while acquired distinctiveness depends on a mark's secondary meaning in the marketplace. Analyzing these two factors in combination, a strong mark under the *Abercrombie* spectrum may be weakened by its lack of secondary meaning while a weak mark can be strengthened by secondary meaning. *See Nabisco*, 32 F.Supp.2d at 697.

■■■■ This case exemplifies the first scenario, where a mark that is inherently distinctive under the *Abercrombie* spectrum is made weak by its lack of acquired distinctiveness in the marketplace of children's goods. All of the members of the GIGGLE family of marks possess an innate amount of potential strength as inherently distinctive suggestive marks. But whatever strength those marks possess by being suggestive succumbs to the weakness evidenced by both the reputation and use of the marks.

#### a. Secondary Meaning

The reputation of the marks is not very substantial since none of the GIGGLE marks have acquired significant secondary meaning. Secondary meaning requires that the consuming public associate Plain-

tiff with the GIGGLE family of marks, looking to the national market as a whole, not just niches. *See Bristol–Myers Squibb*, 973 F.2d at 1040 (stating that secondary meaning assesses whether "the consuming public primarily associates" the mark with the plaintiff). Various types of evidence can attest to a mark's secondary meaning, including consumer surveys and studies, sales studies, and data documenting the amount of investment in advertising and marketing. *See, e.g., Nabisco*, 32 F.Supp.2d at 697–98 ("Secondary meaning is what associates a mark with a particular source in the mind of the consumer, which may be demonstrated by a myriad of factors, including evidence of money spent on [the] product (*i.e.*, advertising and marketing expenditures), success in the marketplace (*i.e.*, sales and consumer studies), recognition by others in the market (*i.e.*, awards or prizes), and length and exclusivity of use (*i.e.*, attempts to plagiarize)." (citing *Bristol–Myers Squibb*, 973 F.2d at 1041)).

Plaintiff has failed to show that its marks resonate with more than a limited audience. While the GIGGLE marks might have gained secondary meaning among industry professionals or in the regional markets where Plaintiff's stores are located, the record does not provide strong evidence that the average consumer of children's goods primarily associates Plaintiff as the source of products bearing a GIGGLE mark. Plaintiff has not presented any significant evidence of secondary meaning, such as surveys of consumers who frequent children's goods retail stores, studies comparing Plaintiff's sales volume to the sales volume of the children's goods industry as a whole, or statistics on marketing and advertising efforts to brand itself. The closest Plaintiff comes to doing so is providing its sales totals for various years, but these bare figures do not speak

to the amount of money spent on advertising or marketing, or to the strength of Plaintiff's presence and renown in the marketplace of children's goods as a whole. Wing Decl. Ex. 8.

The evidence that Plaintiff has submitted also pales in comparison to the types of evidence typically used to demonstrate secondary meaning. Plaintiff offers the undisputed facts that its website (giggle.com) has received more than one million unique hits and that its catalogs have reached more than one million households. Wing Decl. Ex. 9; Wing Decl. ¶ 4. Yet these facts are not enough since volume does not automatically establish secondary meaning. Plaintiff only operated twelve stores in six states at the time it filed suit and, while Plaintiff has produced a handful of cursory mentions and brief blurbs in the *New York Times* and several other national and regional periodicals, it has produced only a few industry-specific articles that discuss its business and goods. Fleming Decl. Ex. G (*New York Times, Daily News, San Francisco Chronicle, New York Sun, Us Weekly,* and *Wall Street Journal* articles); Fleming Decl. Ex. G (*kids today: The Newsmagazine of the Infant and Juvenile Industries, Baby & Me,* and *dwell: At Home in the Modern World* industry—specific articles). While these mentions and blurbs may reflect market recognition, articles do not confer the same level of market recognition as awards or prizes—simply because a reporter knows Plaintiff as "Giggle" does not mean that the reporter's audience, or the consuming public, does as well. A consumer may receive Plaintiff's catalogue, visit its website, or read a blurb about it in a newspaper or magazine but never again associate the GIGGLE mark with Plaintiff.

This leads to Plaintiff's use of its family of marks, which has also diminished the acquired distinctiveness of the GIGGLE marks. Plaintiff argues that its stand-alone use of GIGGLE gives it strong rights in the mark and its family of marks. Quite to the contrary, isolation of a single, common word saps the strength of a mark. *See Gruner,* 991 F.2d at 1077–78 (noting that use of descriptive or weak portions of marks can even overcome the distinctiveness of an incontestably registered mark). As a practical matter, it is much harder to accumulate secondary meaning in a single, commonly-used word since third parties are that much more likely to use such a word and, as a result, dilute the word's secondary meaning and weaken the word as a mark. As Defendant has shown, prevalent third-party use has severely weakened GIGGLE as a stand-alone word mark, along with the other members of its mark family. Consequently, Plaintiff's isolated use of the weakened GIGGLE mark has, in turn, further weakened Plaintiff's entire family of GIGGLE marks.

### b. Third–Party Usage

■ To prove this extensive third-party usage of the GIGGLE mark, Defendant has submitted over forty screenshots of advertisements and websites, four trademark registration search reports, and White Pages listings. First Presta Decl. Exs. H, J, K; Second Presta Decl. Exs. 1–2. When reliable, such evidence of third-party use of a mark is very persuasive in proving lack of secondary meaning. *See Time, Inc. v. Petersen Publ'g Co.,* 173 F.3d 113, 118 (2d Cir.1999) (directing courts to look at "[t]he use of part or all of the mark by third parties" since third-party use "weakens its overall strength"); *Nabisco,* 32 F.Supp.2d at 698 (noting that "extensive use" of the term "Ice" by third parties in the confections field "considerably weaken[ed]" the "Ice Breakers" mark).

Of course, Plaintiff is correct that evidence of third-party marks is relevant only

when indicative of how third parties actually use the marks in commerce, but there are various ways to evidence such actual use. *See Scarves by Vera, Inc. v. Todo Imports Ltd.*, 544 F.2d 1167, 1173 (2d Cir. 1976) (noting that "[t]he significance of third-party trademarks depends wholly upon their usage"); *Gruner*, 991 F.2d at 1078 (noting that third-party uses in public constitute actual use); *see, e.g., Lang v. Retirement Living Pub. Co., Inc.*, 949 F.2d 576, 581 (2d Cir.1991) (finding that the use of a mark in the title of publications evidenced third-party usage).

Numbering over forty, the screenshots of websites and advertisements were used between 1996 and 2009 for products and businesses in the children's goods and services industry. They cover a diverse sample of goods and services, including a screenshot of the website for a "giggle magazine" and fourteen advertisements for a line of Sesame Street Elmo "Giggle" toys, such as the "Giggle Vacuum ™" and "Giggle & Go Cars™." Second Presta Decl. Ex. 1. The evidence of the advertisements and websites, which are themselves not hearsay, was authenticated by an affidavit from Joseph S. Presta, counsel for Defendant. Fed.R.Evid. 801. The screenshot evidence shows that these third parties have been actively using the GIGGLE mark in commerce to sell children's toys, market children's goods and services to the consuming public, and operate businesses in the children's goods and services industry (such as the "Giggle Factory" playland for children and "Giggle Magic" magic shows for children). With such an abundance of third-party use of the GIGGLE mark, especially those usages occurring even before Plaintiff entered the market in 2003, any secondary meaning in Plaintiff's GIGGLE family of marks has been greatly diminished, making Plaintiff's family of marks much weaker.

Next, Defendant submitted four trademark registration search reports, including three produced by Plaintiff, dated July 2003 (First Presta Decl. Ex. H), February 2005 (First Presta Decl. Ex. J), and August 2005 (First Presta Decl. Ex. J), and one, dated 2009, by James Pooton, the President and co-owner of netFocal, Inc. (First Presta Decl. Ex. K; Pooton Decl. ¶ 6). First Presta Decl. ¶¶ 9, 11, 12. This evidence is authenticated and admissible because Plaintiff commissioned three of the search reports itself and produced them to Defendant during discovery. Fed. R.Evid. 801(d)(2). The fourth search report is authenticated by an affidavit from Presta. The Court finds that the search reports are probative of third parties' attempts to use those marks in commerce and is evidence commonly accepted by courts for evaluation of third-party use. *See Estee Lauder Inc. v. The Gap, Inc.*, 108 F.3d 1503, 1511 (2d Cir.1997) (considering registrations and applications for registration or renewal); *Western Publ'g Co. v. Rose Art Indus., Inc.*, 910 F.2d 57, 61 (2d Cir.1990) (considering registrations in relevant product categories); *see also Nabisco*, 32 F.Supp.2d at 698 (considering "over 36 uses and/or registrations of the term 'Ice' on chewing gum, mints, candy, and related products"); *Ivoclar N. Am., Inc. v. Dentsply Int'l, Inc.*, 41 F.Supp.2d 274, 280 (S.D.N.Y.1998) (deciding that the plaintiff's mark was weakened because "Sure, Sure Check, Pre–Sure, Sure Choice, SurGel and SureFire are registered marks of other manufacturers of dental products"); *see also Trustees of Columbia Univ. v. Columbia/HCA Healthcare Corp.*, 964 F.Supp. 733, 744–45 (S.D.N.Y.1997) (deciding that "registrations of the name Columbia, including in the healthcare field, have diluted the strength of the Columbia mark"); *Lexington Mgmt. Corp. v. Lexington Capital Partners*, 10 F.Supp.2d 271, 281–82 (S.D.N.Y.1998) (considering

trademark registration search reports as evidence); *Hutchinson v. Essence Commc'ns, Inc.*, 769 F.Supp. 541, 548 (S.D.N.Y.1991) (stating that "[t]hird-party registration and use dilutes the strength of the trademark").

Moreover, the "use-based" structure of the U.S. trademark system requires that trademark registrants demonstrate past use or a good-faith intent to use their mark in commerce before perfecting registration. 15 U.S.C. § 1051(a), (b); *see* J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 19:1.25 (4th ed. 2011) [hereinafter *McCarthy on Trademarks* ]. Due to this requirement, the fact that a third party has registered a trademark is circumstantial evidence that it has or is likely to use the mark in commerce.

Within the children's goods industry, the July 2003 search report found twenty-three active marks incorporating "giggle" and eighteen incorporating the plural, "giggles." First Presta Decl. Ex. H; Def.'s Mem. Supp. Summ. J. 7. The February 2005 and August 2005 search reports both found forty-one registered marks that feature the word "giggle" or its derivatives for products in the children's goods industry.[1] First Presta Decl. Ex. J. The Pooton search report documented over fifty active registrations for the GIGGLE mark and its derivatives. Like the screenshot evidence of actual use, these search reports further evidence the weakness of Plaintiff's family of marks.

Third and finally, the White Pages listings were taken from an online directory of businesses in 2009. Each White Pages listing names a business, providing its address and, if available, its website; several businesses have multiple listings, with each entry representing a different business location. Second Presta Decl. Ex. 2. This evidence is authenticated by an affidavit from Presta. The White Pages listings also provide probative evidence of third-party usage. Moreover, unlike trademark registration search reports, White Pages listings are readily accessible to the consuming public as they peruse the internet in search of children's goods. *See Lloyd's Food Prods., Inc. v. Eli's, Inc.*, 987 F.2d 766, 767–68 (Fed.Cir.1993) (allowing yellow and white pages listings as evidence on summary judgment for service marks). Like the search report evidence, the vast quantity of listings—over 200 individual entries in the children's goods industry— makes it likely that some of those businesses listed were using those marks in commerce. As such, the Court also gives this White Pages evidence weight toward third-party usage. Together, the evidence of the White Pages listings and search reports corroborates the actual third-party use exhibited by the screenshot evidence.

█ In addition to the considerable evidence of third-party usage, Plaintiff's stylized use of its GIGGLE mark restricts the scope of its potential rights. Multiple facets define a mark beyond the basic letters and words used, including the placement of words, particular colors, special fonts, and the like, as Plaintiff itself stresses. *See Gruner*, 991 F.2d at 1078 (deciding that a mark divorced from its stylistic attributes was weak); *Star Indus., Inc. v. Bacardi & Co. Ltd.*, 412 F.3d 373, 383 (2d Cir.2005). While Plaintiff's GIGGLE family of marks does accentuate "giggle" above all other words, the marks are also stylized with a particular lower-case, Courier-style font and bright, pastel colors. *See, e.g.,* Flem-

---

**1.** "Giggle" derivatives include variations such as "gigle" and "giggle" combined with other words.

ing Decl. Ex. A. Therefore, any strength Plaintiff has acquired in its GIGGLE family of marks is not in the words themselves but in the appearance, colors, and styles associated with Plaintiff's use. In other words, Plaintiff has not shown that it has strong rights in all appearances and uses of the GIGGLE family of marks. Unlike "Coca–Cola" or "Disney," an average consumer, even one familiar with Plaintiff, would not necessarily recognize Plaintiff from the word "giggle" in any format. In any other style, such as black, gothic, Old English font, the connection between the mark and Plaintiff is unclear at best.

### 2. The Similarity of the Marks

 The underlying cause of consumer confusion is that two marks appear similar enough that a consumer concludes that they must come from the same source. *Louis Vuitton,* 454 F.3d at 117. Under the anti-dissection principle, the similarity analysis must assess the marks in their entirety without dissecting out any one component. *See McCarthy on Trademarks* § 11:27; *see also Nabisco, Inc. v. Warner–Lambert Co.,* 220 F.3d 43, 47 (2d Cir.2000); *Gruner,* 991 F.2d at 1078; *New York City Triathlon, LLC v. NYC Triathlon Club, Inc.,* 704 F.Supp.2d 305, 333–34 (S.D.N.Y.2010). While words may be considered more heavily than design components of a mark, the words of a mark must be considered within the mark as a whole. *See New York City Triathlon,* 704 F.Supp.2d at 333.

The dissimilarities between the parties' marks exceed whatever similarities they share. First, Defendant's mark differs visually from Plaintiff's GIGGLE family of marks. As mentioned above, whatever rights Plaintiff has in its GIGGLE family of marks are in a stylized GIGGLE mark as opposed to the word alone. The style—including the font, color, and design—of

Defendant's mark is unlike Plaintiff's family of marks: The letters are black and in a Verdana-style font, the first letter of each word is capitalized, and, at least on Defendant's website, a flower accompanies its logo. Second, the marks are textually different. Defendant's mark only shares a single word—"giggle"—in common with any member of the GIGGLE family of marks and, as discussed above, GIGGLE on its own is an extremely weak mark due to the extensive third-party use of the word and is limited in scope due to Plaintiff's unique stylization of its family of marks.

### 3. The Proximity of the Products

The proximity of the products is an important factor since the likelihood of confusion is greater if parties navigate the same or similar channels of commerce and have customers in common. *Virgin,* 335 F.3d at 150. While both parties operate in the children's goods industry, they service different markets within the industry: They offer very different products through different platforms to different customer bases, creating moderate proximity at most. Plaintiff primarily runs retail stores that sell physical goods to consumers; Defendant runs a website that sells trade information to industry professionals. Further, Plaintiff sells a large variety of goods (from strollers to guidebooks), while Defendant only sells information.

There is some proximity since there is a slight overlap in the customer bases of the parties, but this is minor as shown by the dearth of emails received by Plaintiff. Fleming Decl. Ex. H. The parents decorating brightly colored rooms and entertaining small children are generally not the professionals buying trade information about the children's goods industry.

#### 4. The Likelihood That Plaintiff Will Bridge the Gap

Plaintiff has already drifted over into Defendant's channel of commerce with the publication of its guidebook, so this factor weighs in its favor. Nevertheless, this factor tips slightly against Plaintiff insofar as it has not presented evidence of any intent to turn the hardcopy, consumer form of its guidebook into an online repository of trade information for industry professionals.

#### 5. Actual Confusion

Although likelihood of confusion is not predicated on the existence of actual confusion, this is one of the most indicative and "particularly relevant" factors in this suit. *Virgin,* 335 F.3d at 151. Without proof that Defendant's use of a mark has actually caused confusion, there is less chance that it likely will in the future. *Id.* Even more, if there is proof that consumers are actually *not* confused by Defendant's use of a mark, then that is even stronger proof that there is no likelihood of confusion.

First and foremost, the actual confusion factor assesses consumer confusion. *See SLY Magazine, LLC v. Weider Publ'ns L.L.C.,* 529 F.Supp.2d 425, 440 (S.D.N.Y. 2007) (finding actual confusion because customers attempted to purchase magazine subscriptions based on their confusion); *Playtex,* 390 F.3d at 166 (noting that the confusion of an internet search engine in distinguishing between similar marks did not amount to consumer confusion). Plaintiff offers several emails, including three emails in which two vendors and one manufacturer ask if there is any association between Defendant and Plaintiff. Fleming Decl. Ex. H. The Court notes that the email correspondents address Plaintiff by her first name, "Ali," further suggesting that they are not the average customers of Plaintiff's stores. Fleming Decl. Ex. H. While vendors and manufacturers may be customers of Plaintiff's business, they are not representative of the typical consumer of retail goods. Second and most critically, confusion comes in different varieties, and the variety that matters here is confusion that affects consumer purchases. *Lang,* 949 F.2d at 582–83. The email correspondents were not consumers attempting to buy Plaintiff's goods. Accordingly, the record reflects no evidence that consumers' purchasing decisions have been affected by Defendant's use of its mark.

Moreover, instead of showing actual confusion and helping prove likelihood of confusion, these emails actually show that Defendant's mark is *not* confusing and *not* likely to cause confusion. In each email, the inquirer never expresses a moment of sincere confusion but, rather, conveys surety about the parties' relationship. One inquirer commented that she "quickly realized" that Defendant was not associated with Plaintiff, while another confirmed, "it[']s not you, right?"; a third noted that it was "very hard to tell" if Defendant was associated with Plaintiff. Fleming Decl. Ex. H. Another observed that Defendant's mark did not have "that Giggle feel." Wing Supplemental Decl. Ex. A. Analysis of the other *Polaroid* factors make this an unsurprising observation, given that the marks are not very similar and Plaintiff's marks have limited strength.

#### 6. The Remaining Factors

The Court finds that the last three factors—Defendant's intent in adopting its mark, the quality of its product, and the sophistication of the customer base—are inconsequential to the balance of the *Polaroid* factors in this case.

## C. Balancing the *Polaroid* Factors

The balance of the *Polaroid* factors does not demonstrate a likelihood of confusion between Plaintiff's family of marks and Defendant's mark. With regard to the GIGGLE family of marks, the strength of the plaintiff's mark, similarity of the defendant's mark, proximity of the products, and actual confusion factors weigh in favor of Defendant. Accordingly, the Court grants Defendant's motion for summary judgment on Plaintiff's claims.

## II. Plaintiff's State Law Claims

### A. Unfair and Deceptive Trade Practices

■ Under New York General Business Law § 349, Plaintiff claims that Defendant has "willfully and intentionally traded on the reputation and goodwill of Giggle," causing it irreparable injury. Compl. ¶ 56. Other than the curiosity conveyed by the emails on the record, Plaintiff has not shown a specific or substantial injury, which is a necessary element in establishing this claim. *See Nat'l Distillers Prods. Co. v. Refreshment Brands, Inc.*, 198 F.Supp.2d 474, 486–87 (S.D.N.Y. 2002) ("It is well settled, however, that trademark infringement [ ] claims are not cognizable under [§ 349] unless there is a specific and substantial injury to the public interest over and above ordinary trademark infringement or dilution.").

### B. Unfair Competition

■ Unfair competition under New York law shares most of the same elements as a claim for trademark infringement under the Lanham Act. *W.W.W. Pharm. Co., Inc. v. Gillette Co.*, 984 F.2d 567, 576 (2d Cir.1993); *Tri–Star Pictures, Inc. v. Unger*, 14 F.Supp.2d 339, 363 (S.D.N.Y.1998) ("[T]he standards for Section 43(a) claims of the Lanham Act and unfair competition claims under New York

Law are almost indistinguishable."). Accordingly, if marks are not similar enough to support a claim for trademark infringement, then a plaintiff cannot support a claim for unfair competition either. *See Playtex*, 390 F.3d at 167.

## III. Defendant's Counterclaims

Under the Lanham Act and New York common law, Defendant counterclaims that Plaintiff has infringed its THE GIGGLE GUIDE mark through the marketing of its *Giggle Guide to Baby Gear.* Although there is a disputed issue of material fact about which party was the first and senior user of the mark, the Court does not need to reach this issue to decide whether to grant Defendant judgment in the matter.

### A. Protectability of Defendant's Mark

■ Applying the *Abercrombie* spectrum, the Court finds that the THE GIGGLE GUIDE mark has descriptive traits but is, nonetheless, slightly suggestive. The mark reveals the type of Defendant's product—a guide—but the imagination is needed to arrive at the content of Defendant's product since the mark does not immediately reveal that Defendant is selling information about the children's goods industry. *Abercrombie*, 537 F.2d at 11. This agrees with the Court's determination that the members of Plaintiff's GIGGLE family of marks are suggestive.

### B. Likelihood of Confusion

Since Defendant's mark is protectable, the Court must again apply the *Polaroid* factors to determine if Plaintiff's use of its GIGGLE GUIDE TO BABY GEAR mark is likely to cause confusion with Defendant's THE GIGGLE GUIDE mark.

#### 1. The Strength and Similarity of Defendant's Mark

■ While Defendant's mark has some measure of inherent distinctiveness as a

suggestive mark, Defendant has not submitted any evidence to prove that its mark has acquired additional distinctiveness and strength through secondary meaning. In any case, the evidence of third-party use that Defendant submitted to rebut the strength of Plaintiff's marks also works to expose the weakness of its own mark. With the profuse amount of third-party commercial use, Defendant's mark blends into the crowded field of GIGGLE marks, right alongside Plaintiff's family of marks.

Looking to the similarity factor, Plaintiff's GIGGLE GUIDE TO BABY CARE mark is fairly similar to Defendant's mark since it incorporates the entirety of Defendant's mark except for the article "The," which is the least important word in the mark. Nevertheless, the marks are, as a whole, dissimilar for many of the same stylistic reasons stated in the Court's analysis of Plaintiff's claims, such as the color, font, and arrangement of words.

### 2. Other Factors

The remaining *Polaroid* factors—the proximity of the goods, the likelihood that the mark owner will bridge the gap between it and the alleged infringer, actual confusion, the alleged infringer's intent in adopting the mark, the quality of the alleged infringer's product, and the sophistication of the consumer base—largely resolve in the same fashion as they did for Plaintiff's claims. The parties' goods are proximate but, just as Plaintiff had not shown any intent to publish an online guide for industry professionals, Defendant has not shown any intent to bridge the gap by developing a hardcopy guide for consumer retail customers. Lastly, Defendant has not presented any evidence of actual confusion and the remaining three factors—Plaintiff's intent in adopting the GIGGLE GUIDE TO BABY CARE mark, the quality of its product, and the

sophistication of the consumer base—have very little impact on the analysis.

### C. Balancing the Factors

On balance, the Court finds that there is not a likelihood of confusion between Defendant's mark and Plaintiff's GIGGLE GUIDE TO BABY CARE mark. The lack of strength and similarity in Defendant's mark outweighs the moderate proximity of the parties, and none of the other *Polaroid* factors weigh heavily in Defendant's favor. Accordingly, the Court denies Defendant's motion for summary judgment on its counterclaims.

### Conclusion

For the foregoing reasons, Defendant's Motion for Summary Judgment is GRANTED as to Plaintiff's claims and DENIED as to its counterclaims. The parties are directed to appear for a conference on Defendant's counterclaims on March 15, 2012 at 3PM in Courtroom 17C at 500 Pearl Street, New York, N.Y. 10007.

**SO ORDERED.**